Arlien WOODARD, d/b/a E & J Market, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 82–5374.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1983.

Decided Jan. 23, 1984.

Joe B. Brown, U.S. Atty., Nashville, Tenn., William Cohen, Asst. U.S. Atty., Carlene V. McIntyre, argued, Civil Div., Dept. of Justice, Michael Kimmel, Washington, D.C., for defendant-appellant.

Arlien Woodard, pro se.

Before KENNEDY and WELLFORD, Circuit Judges, and WEICK, Senior Circuit Judge.

WELLFORD, Circuit Judge.

Arlien Woodard, appellee, is the owner of a grocery store, E & J Market, in east Nashville, Tennessee, which is across the street from a public housing project. She applied for authorization to handle and accept food stamps in 1978, estimating sales at $5,000.00 per month. In April of 1979, George Allen, a representative of the Department of Agriculture, personally met with Mrs. Woodard and reviewed proper food stamp procedures, including advice about ineligible items and the prohibition against exchanging cash for food stamps. Redemption of food stamps soon exceeded the estimated monthly amount of sales substantially, whereupon Buford Brown, a food stamp program specialist, visited E & J Market in August of 1979 to discuss the Department's concern. The attention of appellee and that of her son, who assisted her in the grocery operation, was called to the unusually high rate of coupon redemptions, and Mr. Brown expressed concern that violations of the program might be occurring. A letter from the officer-in-charge followed, which confirmed this conversation and contained a copy of the food stamp program regulations. In this letter, the officer concluded by stating:

> You should take special care to prevent violations because they could lead to your disqualification from the Food Stamp Program. You are responsible for violations committed by your employees. Therefore, it is vital that you and your store manager make sure that all of the store's employees, including new and part-time employees, know the program regulations and adhere to them.

Redemption of food stamps, however, continued to run well beyond that of other stores in the area and redemption volume was nearly 63% of store sales;[1] this result-

---

1. The store manager testified that he thought the percentage of food stamp business of E & J Market exceeded this figure by fifteen or twenty per cent, and that he thought the employees of the store were redeeming two or three times as much in volume of food stamps than was estimated the prior year. He also testified that a large percentage of the store's volume (per-

ed in an investigation, beginning in early 1980. On a number of occasions during April, May, and June of 1980, undercover or test purchases were made of a number of non-food, ineligible items[2] with food stamps at E & J Market. In addition, Mr. Woodard's son, as well as another clerk at the store, accepted a total of $90.00 in food stamps in exchange for $65.00 in cash on two separate occasions. The Department set out its charges of these violations in a letter to Mrs. Woodard in September of 1980. She replied orally, and, as she had done on a prior occasion, denied any com-

plicity, and further denied any store policy of countenancing food stamp violations. After consideration of appellee's protestations, and despite her denial of any intentional wrongdoing, the Secretary of Agriculture imposed a one year disqualification in accordance with Section 278.-6(e)(2)(i)(A)(B) and (ii) (7 C.F.R. § 278.6).[3]

Mrs. Woodard filed a timely suit in district court seeking judicial review of the action of the Department of Agriculture. The district judge found jurisdiction under 7 U.S.C. § 2023, a provision of the Food Stamp Act of 1977.[4]

---

haps more than a third) came from sales of beer and cigarettes. Mrs. Woodward in a letter (Exh. C) stated, "the food stamps are 85% of our business."

2. Among the items allowed to be purchased illegally were beer, air-conditioner products, detergents and various paper products.

3. 278.6. Disqualification of retail food stores and wholesale food concerns, and imposition of civil money penalties in lieu of disqualifications.
   (e) Penalties. FNS shall take action as follows against any firm determined to have violated the Act or regulations. The FNS regional office shall:
   (2) Disqualify the firm for 1 year if:
   (i) The evidence shows that:
   (A) It is the firm's policy to sell expensive or conspicuous nonfood items, cartons of cigarettes, or alcoholic beverages, in exchange for food coupons, and the firm has engaged in such practices, or
   (B) The firm bought coupons at discount, and
   (ii) The firm was warned about the possibility that violations were occurring and of the possible consequences of violating the regulations. The regional office may disqualify a firm for 1 year, even though the firm was not warned about the possibility that violations were occurring, if the regional office finds that the firm has committed unusually serious violations of the kind described in (i)(A) or (B) of this subparagraph.
   The applicable regulations under 7 C.F.R. § 278.6, as recently amended, provide stiffer penalties than those regulations governing the instant case for violation of the Food Stamp Act. For example, under 7 C.F.R. 278.6(e)(2), a disqualification of *five* years can be imposed against a firm if it "is to be the firm's first sanction, the firm had been previously advised of the possibility that violations were occurring and of the possible consequences of violating the regulations, and the evidence shows that:
   (1) it is the firm's practice to sell expensive or

conspicuous nonfood items, cartons of cigarettes, or alcoholic beverages in exchange for food coupons...."

4. The pertinent provisions of 7 U.S.C. § 2023 are:
   Whenever ... a retail food store or wholesale food concern is disqualified or subjected to a civil money penalty under the provisions of section 2021 of this title ... notice of such administrative action shall be issued to the retail food store, ... involved. If such store ... is aggrieved by such action, it may, in accordance with regulations promulgated under this chapter, within ten days of the date of delivery of such notice, in support of its position to such person or persons as the regulations may designate. If such a request is not made or if such store, ... fails to submit information in support of its position after filing a request, the administrative determination shall be final. If such request is made by such store, ... such information as may be submitted by the store, as well as such other information as may be available, shall be reviewed by the person or persons designated by the Secretary, who shall, subject to the right of judicial review hereinafter provided, make a determination which shall be final and which shall take effect thirty days after the date of the delivery or service of such final notice of determination. If the store feels aggrieved by such final determination, it may obtain judicial review thereof by filing a complaint against the United States in the United States court for the district in which it resides or is engaged in business, within thirty days after the date of delivery or service of the final notice of determination .... The suit in the United States district court ... shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue. If the court determines that such administrative action is invalid, it shall enter such judgment or order as it determines is in accordance with the law and the evidence.

The district judge recognized that he "had no authority to review the length of the suspension or to change the period authorized by the Secretary", citing *Martin v. United States*, 459 F.2d 300 (6th Cir.), *cert. denied*, 409 U.S. 878, 93 S.Ct. 129, 34 L.Ed.2d 131 (1972). He then conducted a *de novo* trial, questioned the validity of the administrative action, and concluded that the decision of the Secretary to suspend appellee from the food stamp program was "invalid for failure to correctly apply the regulations to the facts of this case." The facts which have been recited in this opinion are substantially the same as those found by the district court; there is no dispute that repeated sales of ineligible items occurred, and that food stamps were illegally converted into cash on two occasions over a three month period at E & J Market.

The district court found that the rate of redemption of food stamps, deemed excessive by appellant, was not "meaningful," because it was based in part on mere projected estimates of sales rather than actual sales. He concluded that to apply the one-year sanction, there "must be a finding of '[the] firm['s] policy' to sell expensive or conspicuous non-food items, or bought coupons at a discount, *and* that there was a warning to the firm that violations were occurring." The district court found the evidence to preponderate "against a finding of [the] firm['s] policy." The court noted that two employees who had improperly discounted coupons were discharged when the matter came to light[5] and that the manager of E & J Market had refused to permit a violation in a test purchase situation by a Department of Agriculture undercover agent. The district court also found that the conversation between Mrs. Woo-

dard and Buford Brown in August of 1979 and the letter confirming that conversation did not constitute a sufficient warning that violations of the regulations were occurring at the store. The district court concluded that the violations at the store occurred as a result of carelessness or poor supervision, making reference to 7 C.F.R. § 278.6(e)(5).[6]

In addition to these conclusions, the district court observed that "[1] the action of the Secretary does not reflect adequate consideration of the possibility of a civil money penalty..., [2] ... a substantial hardship would result to 'food stamp households' in the area if this one-year suspension were applied ..., [and 3] ... the harshness of this penalty is shocking to the conscience of the Court."[7] The district court concluded that the determination of the Secretary was invalid and remanded the case to the Secretary for consideration of a monetary penalty.

We hold that the district court was clearly erroneous in finding that E & J Market had not been warned of the possibility that violations of the Food Stamp Act were occurring and of the possible consequences resulting from violations. The record indicates that Mrs. Woodard received an oral warning that violations might be occurring at E & J Market, which could result in the disqualification of the store from the Food Stamp Program. This warning was clearly confirmed in writing in the letter of August 30, 1979, to which we have alluded. There was a sufficient warning to the appellee on the facts adduced before the district court. Mrs. Woodard did not deny that possible violations were discussed by Mr. Brown, nor did she deny receiving the letter that followed the conversation.

---

**5.** One of the employees was the owner's son, Kenneth, who continued to do odd jobs around the store. "[W]hatever he sees needs to be done ..., he'll do it," (Joint App. at 66) but this work did not include cash register duties.

**6.** 7 C.F.R. § 278.6(e)(5) provides that the Secretary may:

(5) Disqualify the firm for 60 days if the evidence shows that violations such as those

described in paragraph (3)(i) of this subsection occurred, but that the violations resulted from carelessness or poor supervision by the firm's ownership or management.

**7.** The trial judge stated during the course of proceedings that "I'm still looking for a way to help these folks," (Joint App. at 145), referring to appellee.

Trial de novo is to determine, first, if there were violations of the Act, and if there were, to what extent violations did occur and under what circumstances. Next, trial de novo would determine whether administrative action taken with respect to violations found, properly complied with the authority granted under the law and reasonable regulations. In this case, it was virtually conceded that various violations occurred, and the other fact questions dealt with existence of a warning and whether firm or store policy was involved in the violations. The district court found that the same violations occurred that the appellant had previously determined administratively. He found an inadequate warning, but we have concluded that the evidence clearly establishes that a warning was given appellee.

We also have difficulty with the district court's conclusion that there was no store policy to sell conspicuous non-food stamp items or alcoholic beverages in exchange for food coupons, in the face of the other findings, and the buying of coupons at discount by store employees. It was unquestioned that over a considerable period of time E & J Market experienced a very high rate or proportion of sales based on food coupon transactions in comparison with other stores in the area, and that on the test buys a high percentage of the transactions involved accepting food stamps for ineligible items. This would clearly relate to a practice or policy of the store, contrary to the food stamp regulations, whether or not actually known to the owner, Mrs. Woodard. In making the recommendation for a one year suspension in this case for store policy violations, the officer-in-charge's case summary dated September 18, 1980, made reference to the facts and instructions or guidelines utilized by the Food and Nutrition Service of the Department of Agriculture, which provide that store policy will be found where persons actively involved in the violations are:

(1) *The owner, spouse, sons, daughters, or other close relatives* of the owner who are regularly involved in the operation of the store.

(2) *Members of management,* including a person designated as a clerk, but who is in effect running the store in the absence of the owner for extended periods of time or on a regular basis.

(3) *Two or more clerks* who sell common grocery-type or major non-grocery-type ineligible items without refusal during the course of the investigation when there is a record of previous compliance action which documents that the owner or appropriate store official had been cautioned about the possibility of violations occurring in the store and the consequence of being found violating.

FNS Instructions 744–9, III B 1 a.

We believe these guidelines are a reasonable interpretative aid in construing the law and the regulations here involved, although they are not binding upon the court in a *de novo* trial. The trial judge made no reference to these guidelines and gave insufficient attention to the relationship of the clerks involved in the violation to the store's owner. One clerk involved was Mrs. Woodard's son, brother of the manager, and it appears also that a daughter may have been involved.[8] The record reflects that for large periods of time the brother who served as manager was not at the store because he was involved in other family enterprises (a laundromat and a Dairy Dip).

In this case, not only were there two or more clerks who persistently sold non-grocery type ineligible items during the course of investigation after the appropriate store officials were warned about food stamp violations, but also at least one of those actively involved was a close relative of the owner and manager. Applying the guidelines, when coupled with the occurrences of illegal cashing (at a discount) of the food cou-

---

**8.** The son who was the manager of the store was asked: "Q. Did you ever have in 1980, have any other women working for you beside your sister and your mother? A. No, that's about it.... [W]e always tried to keep two men there at all times, you know." (Joint App. at 73). (A female clerk was one of those involved in the violations.)

pons themselves,[9] we must conclude that the district court was in error, because of evident sympathy for the plight of appellees if a one-year violation were imposed, in determining that these continuing violations did not constitute store policy. *See Lawrence v. United States,* 693 F.2d 274 (2d Cir.1982); *Nowicki v. United States,* 536 F.2d 1171 (7th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1103, 51 L.Ed.2d 537 (1977). *Compare Otto v. Block,* 693 F.2d 472 (5th Cir.1982).

The facts found by the district court and the Food Stamp Administration, relative to the violations which occurred and their nature and the circumstances involving close relatives of the owner, are substantially the same. We have determined that the facts before the district court (as well as before the administrative agency) relating to warning were sufficient to fulfill the requirements of the regulation that "the firm was warned about the *possibility* that violations were occurring and of the *possible* consequences of violating the regulations." 7 C.F.R. 278.6(c)(2)(B)(ii) (emphasis added) (*see* n. 3).

We construe the regulations, which are reasonable, to authorize a one year suspension in the instant case if it were demonstrated: (1) that it was the grocery store's practice to sell conspicuous non-food stamp items, as E & J Market did; (2) that E & J Market also had the practice of buying coupons at discount, and that it was warned about possible violations that were occurring; and (3) that the owner's son and daughter assisted in running the store and were actually involved in the violations. All these factors demonstrate the requisite "policy," which the district judge declined to recognize, and he failed even to make reference to the guidelines and regulations

which point toward a conclusion of a "firm's policy" in these circumstances.

◼ Determination of a sanction to be applied by an administrative agency, if within bounds of its lawful authority, is subject to very limited judicial review. *Kulkin v. Bergland,* 626 F.2d 181, 184 (1st Cir.1980). " 'The relation of remedy to policy is peculiarly a matter of administrative competence.' " *Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 185, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973) (quoting *American Power Co. v. S.E.C.,* 329 U.S. 90, 112, 67 S.Ct. 133, 146, 91 L.Ed. 103 (1946)). The reviewing court's function is only to "determine the validity of the questioned administrative action," not to review the sanctions. *Martin v. United States,* 459 F.2d at 302; *G.H. Miller & Co. v. United States,* 260 F.2d 286, 296 (7th Cir.1958) (*en banc*) *cert. denied,* 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959).

> While the de novo provision of the Food Stamp Act raises certain problems, it does not, in our view, call for a departure from the usual standard of review concerning sanctions.

*Kulkin v. Bergland* at 184; *see also Broad Street Food Market, Inc. v. United States,* 720 F.2d 217 at 220 (1st Cir.1983). Once the trial court confirmed that there were repeated violations of the law and regulations as determined by appellant, "the court's only reasoning task is to examine the sanction imposed in light of the administrative record to judge whether the agency properly applied the regulations, *i.e.,* whether the sanction is 'unwarranted in law ... or without justification in fact....' " *See Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 185–189, 93 S.Ct. 1455, 1457–1459, 36 L.Ed.2d 142 (1973), cited in *Broad*

**9.** FNS Instructions 744–9 IV B, dealing with the assignment of a one-year disqualification, indicates that the penalty should be assessed "if any of the following situations is present:"
   a. It is the operating policy of the firm as defined in section III B 1, above, to sell ineligible items, and on three or more occasions personnel of the firm are found to have sold major non-grocery-type ineligible items as defined in section III A 2 a, above.

   b. Major non-grocery-type ineligible items are sold on fewer than three occasions, but the item or items are so expensive that further evidence is not needed to establish the predilection of the firm to violate seriously.
   c. *Personnel of the firm discounts food stamps for cash.*
(Emphasis added).

*Street Food Market, supra,* at 220. We agree with the First Circuit's rationale in this respect. *Cf. Cross v. United States,* 512 F.2d 1212, 1218 (4th Cir.1975) (*en banc*). *See also* the incisive dissent by Russel, J., in the latter case at 1222; *Wolf v. United States,* 662 F.2d 676, 678 (10th Cir.1981).

The district court in this case was concerned with whether there was a store policy to permit violations, not whether there were violations, because it was apparent that a number of violations did occur involving the storeowner's immediate family. We have concluded that application of the guidelines, while not controlling, clearly indicates by strong implication that more than mere carelessness or poor supervision was involved.

The case summary for administrative action in this case, prepared by appellant's officer-in-charge, indicated a full consideration of factors relating to effects of disqualification of appellee store:

> Three city blocks east of subject store is a large, modern supermarket which stocks a greater selection of food items in all the basic staple food items, including fresh meats and produce, at prices that are lower than those found in subject store. This store is also on the edge of the housing project. There are three other authorized stores within three blocks of subject which offer an adequate selection of basic staple food items at prices that are comparable to those found in subject store. There is no reason to suspect that disqualification of subject store would cause an undue hardship on area recipients.

The only further finding made by the district judge in respect to this administrative conclusion of no substantial hardship to area food stamp customers was that appellee's store was open longer hours and offered delivery service. There was no dispute that four other authorized food stamp stores were located within three blocks of the subject store, indicating no real inconvenience involved to food stamp users if the disqualification were applied. Not a single area resident testified on this subject before the district court. That there would be serious financial hardship to appellee is not a factor to be taken into account in this analysis. The district court was obviously concerned about a potential closing of the store and its effect on the owner if the penalty were applied in reaching his conclusion that the penalty was shocking to his conscience.

Finally, in addition to the clear authority in this Circuit that district courts are not to review, except very narrowly, the sanctions applied after a de novo review of the facts pertaining to existence of violations, we find the legislative history noted in *Broad Street Food Market, Inc., supra,* at 219, to be very persuasive:

> The Committee wants to go on record as noting that, when there is imposition of disqualification for such period of time as may be determined in accordance with regulations ... the Committee does not intend that, in the trial de novo in the United States district court or state court of the final administrative determination of disqualification imposed would itself be subject to judicial review as several courts have held that it is. See *Goodman v. United States,* 518 F.2d 505 (5th Cir. 1975) and *Cross v. United States,* 512 F.2d 1212 (4th Cir.1975) (*en banc*). But see *Martin v. United States,* 459 F.2d 300 (6th Cir.), *cert. denied,* 409 U.S. 878 [93 S.Ct. 129, 34 L.Ed.2d 131] (1972) and *Save More of Gary, Inc.,* 442 F.2d 36 (7th Cir.), *cert. dismissed,* 404 U.S. 987 [92 S.Ct. 535, 30 L.Ed.2d 549] (1971). The trial de novo as set forth in section 14 [section 2023] should be limited to a determination of the validity of the administrative action, but not of the severity of the sanction. Review of the factual determination that a violation occurred is normal grist for the courts; review of the length of highly discretionary a [sic] sentence of disqualification is not.

H.R.Rep. No. 464, 95th Cong., 1st Sess. 397–98, *reprinted in* 1977 U.S.Code Cong. & Ad. News 1978, 2326–27.

Additional policy reasons were advanced for the holding we make in this case in

*Kulkin v. Bergland,* 626 F.2d at 185 (footnote omitted):

> From a practical standpoint (it would not make sense for a court to substitute its judgment for that of the agency charged with administering the food stamp program as to the appropriate penalty for a given violation. The agency, in contrast to a court, deals with the relationship of penalty to violation on a frequent basis. If the myriad federal and state courts were to determine the penalty, uniformity and coherence of administration would be difficult to achieve. We find nothing in section 2023 or its legislative history indicating a departure from the usual allocation of functions between court and agency vis-a-vis the assessment of sanctions was intended.

Accordingly, we REVERSE the judgment of the district court and re-AFFIRM the action of appellant in the imposition of a one-year disqualification of appellee Market.

CORNELIA G. KENNEDY, Circuit Judge, dissenting.

I agree with the majority with respect to the scope of the District Court's review of the Secretary of Agriculture's action in this case. The statute provides that review "shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action." 7 U.S.C. § 2023. To be valid the action must comply with the applicable statutes and regulations. The District Court may not, however, review matters the statutes and regulations leave to the Secretary's discretion. I therefore agree with the majority that the District Court's reversal of the Secretary's action cannot be supported by its finding that the Secretary did not adequately consider hardship to the community when declining to impose a civil money penalty rather than a suspension. The District Court was within its authority, however, when it made factual findings concerning whether the firm's policy was to sell alcohol or expensive or conspicuous nonfood items for food stamps and whether the firm had received a warning; these requirements for a one-year suspension are both in the regulations. I therefore agree with the majority that the question posed to this Court is whether those findings were clearly erroneous. I also agree that the District Court was clearly erroneous in finding that there was no warning. I dissent, however, from the majority's holding that the District Court's finding with regard to the firm's policy was clearly erroneous.

I do not quarrel with the majority's recital of the evidence regarding the firm's policy. There was evidence sufficient to support a finding that there was such a policy. I also agree that the evidence adverse to Mrs. Woodard falls within the guidelines utilized by the Food and Nutrition Service of the Department of Agriculture. However, as the majority notes, these guidelines are not binding on the District Court in the *de novo* trial. The guidelines are merely rules of thumb to assist government investigators. A District Court is free to draw inferences other than those suggested by the guidelines. It is not clearly erroneous if it does so.

There was persuasive evidence that it was *not* the firm's policy to sell alcoholic beverages for food stamps.[1] Mrs. Woodard's eldest son, who was also the store manager, refused to sell nonfood items on the only occasion on which he was tested. Both Mrs. Woodard and the manager testified that employees were instructed not to take food stamps for nonfood items. The offending employees were fired although the younger son did continue to help out at the store. Mrs. Woodard herself, although she usually worked in the store, did not work there during the three months in question because she was hospitalized for

---

1. The regulation applied by the Secretary requires a policy to sell "expensive or conspicuous nonfood items, cartons of cigarettes, or alcoholic beverages" for food coupons. 7 C.F.R. § 278.6(e)(2)(i)(A). Since none of the violations involved expensive or conspicuous nonfood items or cartons of cigarettes, a finding of such a policy must be based solely on the three beer sales made to investigators for food stamps.

phlebitis. The employees who accepted food stamps improperly did so when the manager was not there. They worked in the late afternoon and evening.

Under the totality of the evidence, I believe the District Court was not clearly erroneous in concluding that the offending employees were acting on their own and not in accordance with the store's policy.

The evidence regarding the amount of food stamps received by the store and the volume of food sold is persuasive that violations occurred, but there is no evidence that Mrs. Woodard or her manager son had examined these figures. The testimony of Mr. Brown, who met with the Woodards to warn them that their food stamp redemptions were excessive, is less than clear. I cannot tell if he told them that 75% of their food sales were paid for with food stamps or that 92% were. The son testified that he believed Mr. Brown was satisfied after that meeting that the food stamp redemptions were high because the store was across from a public housing project.[2]

The District Judge had the opportunity to see Mrs. Woodard and her manager son. He apparently found them credible witnesses. I would uphold his finding.

There is no dispute but that the alternative ground for a one-year disqualification was established, namely, the firm bought coupons at a discount. 7 C.F.R. § 278.-6(e)(2)(i)(B). This does not, however, permit affirmance. We do not know what penalty the Secretary would impose were this the only violation. It seems unlikely that Mrs. Woodard was aware of this practice. It is much more likely that the employees who engaged in this practice pocketed the discount from the face value of the

stamps. The Secretary should be permitted to exercise his discretion as to what penalty he will impose based on the findings of the District Court, as corrected.

Accordingly, I dissent.

---

**2.** It may be that my disagreement with the majority arises from whether we are talking about the policy advocated by management or policy actually produced by the employees. The possibility of this confusion was recognized by the Department of Agriculture and has been addressed in the present regulations. The Department amended its regulations in 1982 to delete all reference to the "firm's policy," giving its reasons as follows:

Traditionally, the length of the period of disqualification has been based, in part, on

whether it was the firm's policy to violate. Because of the difficulty in defining, and confusion surrounding the concept of firm policy, the Department has replaced the "firm's policy" with the new term "firm's practice". This change is intended to render a firm liable for the violative actions of its employees regardless of whether a policy to violate is announced or advocated by firm management.

47 Fed.Reg. 56,470 (1982).