**Gary MOSLEY**

v.

**TENNESSEE DEPARTMENT OF COMMERCE AND INSURANCE.**

Court of Appeals of Tennessee, at Nashville.

Aug. 6, 2004 Session.

Nov. 22, 2004.

Permission to Appeal Denied by Supreme Court May 9, 2005.

**310**

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General, and Sarah Ann Hiestand, Senior Counsel, Financial Division, Office of the Attorney General, for the appellant, Tennessee Department of Commerce and Insurance.

Ernest W. Williams, Anna Elizabeth Freeman, and D. Scott Porch, IV, Franklin, Tennessee, for the appellee, Gary Mosley.

## OPINION

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

This appeal involves a decision by the Tennessee Department of Commerce and Insurance to revoke the license of an insurance agent after finding that he had repeatedly sold insurance policies in states where he was not licensed. The agent filed a petition for review in the Chancery Court for Davidson County arguing that the licensing statute was unconstitutionally vague and that the record did not support the Department's decision. The trial court found that the record supported the Department's conclusion that the agent had sold policies in states where he was not licensed but determined that the agent's license should be suspended for six months rather than revoked. The Department appealed to this court. We reverse the judgment and reinstate the Department's revocation order.

Gary Mosley, at the time of the events involved in this case, was a licensed insurance agent with more than twenty-five years experience. He was licensed to sell insurance in Tennessee, Kentucky, Mississippi, and Indiana; however, he was not licensed to sell insurance in the states of Virginia and Georgia. As far as this record shows, Mr. Mosley had no record of prior administrative discipline problems or any other activities that would reflect adversely upon him in his profession.

The Administrative Law Judge (ALJ) made extensive findings of fact and conclusions of law in an initial Order filed March 15, 2002 following a hearing on October 16, 2001. No application, pursuant to Tennessee Code Annotated section 4–5–315, for a review of the initial Order by the agency was filed, and, by Order of April 2, 2002, the initial Order became the Final Order pursuant to Tennessee Code Annotated section 4–5–318(f)(3). The Order of the ALJ revoked Mr. Mosley's insurance license and assessed penalties in the amount of $25,000 against him.

Mosley filed a Petition for Judicial Review pursuant to Tennessee Code Annotated section 4–5–322, which was heard before the Chancery Court of Davidson County on September 20, 2002 on the briefs of the parties, the administrative record, and the statements of counsel. The court, on May 7, 2003, entered its Memorandum and Order finding no fault with the facts as determined by the ALJ but reducing the penalties imposed by the Administrative Tribunal stating:

The Court concludes that the Petitioner's license should be temporarily sus-

pended for a period of six (6) months from the date of the ALJ's order, and that his license should then be activated at the conclusion of the six months. Further, the Petitioner should be and is hereby assessed a fine in an amount which represents the total commissions he earned on the aforementioned policies.

The facts as found by the ALJ are in all essential respects conceded by Mosley to be true. These findings are:

1. The Tennessee Insurance Law, as amended, Tennessee Code Annotated Title 56 (hereinafter referred to as the "Law") places the responsibility for the administration of the Law on the Commissioner of Commerce and Insurance (hereinafter referred to as the "Commissioner"). Tenn.Code Ann. §§ 56–1–202, 56–6–155. The Division is the lawful agent through which the Commissioner discharges this responsibility.

2. Gary C. Mosley (hereinafter referred to as "Mosley"), is a citizen of the State of Tennessee, residing at 817 Preston Road, Antioch, Tennessee. Mosley, at all times relevant to the events herein, has been licensed by the Commissioner to sell insurance in this state as an insurance agent. Mr. Mosley has held an insurance agent's license since 1976. He is licensed to sell insurance in Kentucky, Mississippi, and Indiana as well. Mr. Mosley does not have and has never held insurance licenses in Georgia or Virginia.

3. On or around November 27, 1995, Mosley went to the house of Betty S. Edmondson (hereinafter referred to as "B. Edmondson"), located in Rossville, Georgia. While at B. Edmondson's home, Mosley sold B. Edmondson a replacement life insurance policy issued by Pyramid Life Insurance Company (hereinafter referred to as "Pyramid").

4. On the Application for Life Insurance, which was filled out by Mosley, Mosley noted in the appropriate box that the application was signed by B. Edmondson in Chattanooga, Tennessee. B. Edmondson actually signed the application in Rossville, Georgia.

5. As of the date of the hearing, Mosley has received commissions from the sale of this policy to B. Edmondson in the amount of Four Hundred Eight Dollars and eighty cents ($408.80).

6. Mosley testified at the hearing that he placed "Chattanooga, Tennessee" in the signed at box because he was in a suburb of Tennessee, albeit one in the State of Georgia, and that B. Edmondson had previously purchased a Pyramid insurance policy by someone out of Pyramid's Chattanooga office.

7. While at B. Edmondson's home in Rossville, Georgia, Mosley also sold B. Edmondson a Medicare Supplement policy issued by Pyramid. This was not an exchange or replacement policy.

8. On the Application for Medicare Supplement Policy, which was filled out by Mosley, Mosley noted in the appropriate box that the application was signed by B. Edmondson in Chattanooga, Tennessee. B. Edmondson actually signed the application in Rossville, Georgia.

9. As of the date of the hearing, Mosley has received commissions from the sale of this policy to B. Edmondson in the amount of Six Hundred Fourteen Dollars and forty-two cents ($614.42).

10. On or around November 27, 1995, Mosley went to the house of Eddie E. Edmondson (hereinafter referred to as "E. Edmondson"), located in Rossville, Georgia. While at the home of E. Edmondson, Mosley sold E. Edmondson a replacement life insurance policy issued by Pyramid.

11. On the Application for Life Insurance, which was filled out by Mosley, Mosley noted in the appropriate box that the application was signed by E. Edmondson In Chattanooga, Tennessee. E. Edmondson actually signed the application in Rossville, Georgia.

12. As of the date of the hearing, Mosley has received commissions from the sale of this policy to E. Edmondson in the amount of Five Hundred Forty–Six Dollars ($546.00).

13. Mosley testified at the hearing that he placed "Chattanooga, Tennessee" in the signed at box because E. Edmondson had previously purchased a Pyramid insurance policy by someone out of Pyramid's Chattanooga office, and was, in Mosley's words, a "Chattanooga policyholder.["] Mosley testified that he read this portion of the application before he signed it, and that he incorrectly filled out the "Signed At" box anyway. Mosley also testified that he knew at the time that he sold E. Edmondson this policy that E. Edmondson had to be in Tennessee for Mosley to lawfully sell him this policy.

14. While at E. Edmondson's home in Rossville, Georgia, Mosley also sold E. Edmondson a Medicare Supplement policy issued by Pyramid. This policy did not replace or exchange any policy issued by Pyramid.

15. On the Application for Medicare Supplement, which was filled out by Mosley. Mosley noted in the appropriate box that the application was signed by E. Edmondson in Chattanooga, Tennessee. E. Edmondson actually signed the application in Rossville, Georgia.

16. As of the date of the hearing, Mosley has received commissions from the sale of this policy to E. Edmondson in the amount of Six Hundred Fifty Dollars and thirty cents ($650.30).

17. Mosley testified at the hearing that he placed "Chattanooga, Tennessee" in the signed at box because E. Edmondson had previously purchased a Pyramid insurance policy by someone out of Pyramid's Chattanooga office, and was, in Mosley's words, a "Chattanooga policyholder." Mosley testified that he read this portion of the application before he signed it, and that he incorrectly filled out the "Signed At" box anyway. Mosley also testified that he knew at the time that he sold E. Edmondson this policy that E. Edmondson had to be in Tennessee for Mosley to lawfully sell him this policy.

18. On or around November 27, 1997, Mosley went to the house of Faye T. Stephens (hereinafter referred to as "Stephens"), located in Rossville, Georgia. While at Stephens' home, Mosley sold Stephens a replacement life insurance policy issued by Pyramid.

19. On the Application for Life Insurance, which was filled out by Mosley, Mosley noted in the appropriate box that the application was signed by Stephens in Chattanooga, Tennessee. Stephens actually signed the application in Rossville, Georgia.

20. Mosley testified at the hearing that he was aware that Stephens had to be in the State of Tennessee in order to legally sell her this policy. In fact, Mosley testified that he told Stephens that technically he could not write this policy for her unless she was located in the State of Tennessee, however, he wrote it anyway.

21. As of the date of the hearing, Mosley has received commissions from the sale of this policy to Stephens in the amount of Five Hundred Forty–One Dollars and twenty-seven cents ($541.27).

22. On or around February 20, 1997, Mosley went to the house of Richard R. Mabe (hereinafter referred to as "R. Mabe"), located in Ringgold, Georgia. While at R. Mabe's home, Mosley sold R. Mabe a replacement life insurance police issued by Pyramid.

23. On the Application for Life Insurance, which was filled out by Mosley, Mosley noted in the appropriate box that the application was signed by R. Mabe in Chattanooga, Tennessee. R. Mabe actually signed the application in Ringgold, Georgia.

24. Mosley testified at the hearing that he placed "Chattanooga, Tennessee" in the signed at box because R. Mabe was originally from Tennessee, and that part of the solicitation and sale occurred at R. Mabe's place of business in Chattanooga, Tennessee. Mosley also testified, however, that part of the sale took place in Ringgold, Georgia, as well.

25. As of the date of the hearing, Mosley has received commissions from the sale of this policy to R. Mabe in the amount of Six Hundred Fifty–Two Dollars and seventy-six cents ($652.76).

26. On or around April 2, 1997, Mosley went to the house of R. Mabe, located in Ringgold, Georgia. While at R. Mabe's home, Mosley attempted to sell R. Mabe's daughter, April J. Mabe (hereinafter referred to as "A. Mabe"), a life insurance policy issued by Pyramid.

27. On the Application for Life Insurance, which was filled out by Mosley, Mosley noted in the appropriate box that the application was signed by A. Mabe in Chattanooga, Tennessee. A. Mabe actually signed the application in Ringgold, Georgia.

28. Mosley testified at the hearing that he placed "Chattanooga, Tennessee" in the signed at box because A. Mabe was working in Tennessee, and

that part of the solicitation and sale occurred at A. Mabe's place of business in Chattanooga, Tennessee. Mosley also testified, however, that at the time he completed this application for A. Mabe he knew that she was residing in Georgia, and that the application was being filled out in Georgia.

29. On or around February 20, 1997, Mosley went to the house of B. Alvin Morgan (hereinafter referred to as "Morgan") located in Chickamauga, Georgia. While at Morgan's home, Mosley sold Morgan a Medicare Supplement Policy issued by Pyramid.

30. On the Application for Medicare Supplement Policy, which was filled out by Mosley. Mosley noted in the appropriate box that the application was signed by Morgan in Chattanooga, Tennessee. Morgan actually signed the application in Chickamauga, Georgia.

31. At the hearing, Mosley failed to say why he placed "Chattanooga, Tennessee" in the signed at box. Mosley did state that neither he nor Pyramid had any existing relationship with Morgan, as opposed to some of the other policyholders referenced herein.

32. As of the date of the hearing, Mosley has received commissions from the sale of this policy to Morgan in the amount of Five Hundred Forty–One Dollars and twenty-seven cents ($541.27).

33. On or around April 18, 1997, Mosley again went to Morgan's home in Chickamauga, Georgia. While at Morgan's home, Mosley sold Morgan a Long Term Care Policy issued by Pyramid.

34. On the Application for Home Health Care or Long Term Care Coverage, which was filled out by Mosley, Mosley noted in the appropriate box that the application was signed by Morgan in Chattanooga, Tennessee. Mor-

gan actually signed the application in Chickamauga, Georgia. Mosley testified at the hearing that he knew that Morgan had to come to Tennessee in order to lawfully sell Morgan this policy, but that he placed "Chattanooga, Tennessee" in the signed at box in order to keep Morgan from having to drive to Tennessee from his home in Georgia.

35. As of the date of the hearing, Mosley has received commissions from the sale of this policy to Morgan in the amount of Two Thousand Nine Hundred Sixty–Two Dollars and eighteen cents ($2,962.18).

36. On or around April 2, 1997, Mosley went to the house of Morgan located in Chickamauga, Georgia. While at Morgan's home, Mosley sold Leola A. Dunbar (hereinafter referred to as "Dunbar") a replacement life insurance policy issued by Pyramid.

37. On the Application for Medicare Supplement Policy, which was filled out by Mosley. Mosley noted in the appropriate box that the application was signed by Dunbar in Chattanooga, Tennessee. Dunbar actually signed the application in Chickamauga, Georgia.

38. Mosley testified at the hearing that he was aware that Dunbar was living in the State of Georgia with her daughter and son-in-law when he sold her this policy in Chickamauga, Georgia. Mosley testified that he placed "Chattanooga, Tennessee" in the signed at box in order to prevent the need for Dunbar to travel to Tennessee to lawfully enter into this contract of insurance. As of the date of the hearing, Mosley has received commissions from the sale of this policy to Dunbar in the amount of One Thousand One Hundred Ninety Dollars and sixteen cents ($1,190.16).

39. On or around December 16, 1997, Mosley went to the house of Dallas C. Compton (hereinafter referred to as "Compton"), located in Cave City, Virginia. While at Compton's home, Mosley sold Compton a Medicare Supplement Policy issued by Pyramid.

40. On the Application for Medicare Supplement Policy, which was filled out by Mosley, Mosley noted in the appropriate box that the application was signed by Compton in Kingsport, Tennessee. Compton actually signed the application in Cave City, Virginia.

41. Mosley testified at the hearing that he was aware that Compton had to be in the State of Tennessee in order to legally sell him this policy.

42. As of the date of the hearing, Mosley has received commissions from the sale of this policy to Compton in the amount of Five Hundred Fifty–Seven Dollars and ninety-six cents ($557.96).

43. On or around December 16, 1997, Mosley went to the house of George and Allie Carter (hereinafter collectively referred to as the "Carters"), located in Gate City, Virginia. While at the Carters' home, Mosley sold the Carters a replacement Medicare Supplement Policy issued by Pyramid.

44. On the Application for Medicare Supplement Policy, which was filled out by Mosley. Mosley noted in the appropriate box that the application was signed by the Carters in Kingsport, Tennessee. The Carters actually signed the application in Gate City, Virginia.

45. Mosley testified at the hearing that he was aware that the Carters had to be in the State of Tennessee when he sold them this policy.

46. As of the date of the hearing, Mosley has received commissions from the sale of this policy to the Carters in the amount of Seven Hundred Ninety Dollars and seven cents ($790.07).

47. Mosley has never been licensed as an insurance agent in the State of Georgia or the Commonwealth of Virginia.

48. Pyramid's Agent Underwriting and Administration Manual stated that "The agent must be properly contracted and appointed to solicit for the Company and properly licensed in the state of solicitation." The Respondent admitted that he had read this document. Tr., at 55.

49. Glenn Parker, Pyramid's Senior Vice–President of Sales and the Respondent's supervisor, testified that Pyramid requires its agents to be licensed in the state where the application is taken or the business is transacted. Parker defined "where the application is taken" as the place where the agent meets the perspective insured, completes the necessary forms and obtains the necessary signatures. Parker also testified that it is Pyramid's position that a person may not go into another state to obtain a signature for an application for insurance, if that agent does not have a license in the state to where he/she is going.

50. Parker testified that if the Respondent had placed the proper state on the applications discussed above, Pyramid would have returned to the perspective insured both the premium and the application. Parker further testified that the Respondent would not have received a commission from Pyramid had he properly disclosed the state in which the above policies were written.

51. Parker testified that those policies that were sold through a 1035 Exchange were actually replacement policies which replaced policies which the insured already had in force. Parker testified that, from Pyramid's perspective, the sale of these replacement poli-

cies by the Respondent did not have any effect on the licensure requirements stated above.

52. Parker testified that, in his opinion, that he knew the Respondent to be truthful. Parker also testified, however, that should the facts alleged by the Division be true, it would affect his opinion as to whether he felt the Respondent is truthful.

53. The Respondent conceded the substance of the preceding facts. In his defense, he asserted that he was sent by his superiors at Pyramid to call on those of the above-named individuals who were former or existing clients of the Respondent and Pyramid and who formerly received services from Pyramid out of the Chattanooga or Knoxville Pyramid offices. He stated that he met with the individuals outside of Tennessee as an accommodation to each individual on account of the individual's infirmity, convenience or otherwise. At the time of the hearing, Pyramid had paid the Respondent a total of $9,161.71 in commission on the transactions at issue here.

54. The Respondent objected that the State did not introduce evidence of the laws of Virginia or Georgia. He noted that none of the policyholders who testified had complaints against him, and most of the applications at issue were executed by persons already Pyramid policyholders and many of the applications were exchanges of one pyramid policy for another.

In her conclusions of law based upon these extensive findings of fact, the Administrative Law Judge held that the State had met its burden of proof by a preponderance of the evidence that the conduct of Mosley warranted revocation of his license. In summary the ALJ held:

Mosley left no doubt that he was aware he was supposed to be conducting business within the state borders of Tennessee, and that he was knowingly falsifying the insureds' application records by recording the place of the transaction as in Tennessee when it was not so. In so doing, he intentionally acted in a manner that violated the insurance laws of the states of Tennessee, Georgia and Virginia and the requirements of his company, Pyramid. His conduct was fraudulent, dishonest, incompetent, untrustworthy and financially irresponsible in that the insureds could have lost the coverage they believed they had.

■ In this proceeding under the Uniform Administrative Procedures Act, Tennessee Code Annotated §§ 4–5–101 to 4–5–325, this Court's review of the facts is limited to a determination of whether or not there is substantial and material evidence in the record to support the decision of the administrative agency. *See Goldsmith v. Roberts,* 622 S.W.2d 438 (Tenn.Ct. App.1981).

■ Trial and appellate standards of review are set forth in *Gluck v. Civil Service Commission,* 15 S.W.3d 486 (Tenn.Ct. App.1999) wherein it is held:

The chancellor's review of the Commission's decision is governed by T.C.A. § 4–5–322(h) (1998), which sets forth the standard of review on appeal of administrative proceedings as follows:

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5) Unsupported by evidence which is both substantial and material in the light of the entire record.

In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

The scope of review in this Court is the same as in the trial court, to review findings of fact of the administrative agency upon the standard of substantial and material evidence. *DePriest v. Puett,* 669 S.W.2d 669 (Tenn.Ct.App. 1984). Although what amounts to "substantial and material" evidence provided for in T.C.A. § 4–5–322(h) is not clearly defined. It is generally understood that "it requires something less than a preponderance of the evidence, (citations omitted) but more than a scintilla or glimmer." *Wayne County v. Tennessee Solid Waste Disposal Control Bd.,* 756 S.W.2d 274, 280 (1988).

While this Court may consider evidence in the record that detracts from its weight, the court is not allowed to substitute its judgment for that of the agency concerning the weight of the evidence. T.C.A. § 4–5–322(h), *Pace v. Garbage Disposal Dist.,* 54 Tenn.App. 263, 266, 390 S.W.2d 461, 463 (1965). The evidence before the tribunal must be such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion and such as to furnish a reasonably sound basis

for the action under consideration. *Pace,* 54 Tenn.App. at 267, 390 S.W.2d at 463.

*Gluck,* 15 S.W.3d at 489–90.

While the extensive recitation of the findings of fact made by the Administrative Law Judge is not necessary to our decision under this limited standard of review, we recognize that by this decision we are reversing the decision of the chancellor and reinstating the administrative tribunal's imposition of the ultimate sanction, the revocation of the license of an insurance agent with a 28 year previously unblemished record. Since the chancellor found, and indeed Mr. Mosley conceded, that the facts as found by the ALJ were essentially true, the case narrows down to the propriety of the sanctions imposed on Mr. Mosley by the administrative tribunal. The chancellor felt that the sanctions were too drastic and reduced the judgment of the administrative tribunal to a six month suspension and a fine limited to the actual amount of the commissions paid to Mr. Mosley for the sales of the policies in issue in the case. The State appeals the chancery court's reduction of the sanctions.

■■■ Mr. Mosley asserts that Tennessee Code Annotated section 56–6–155 is unconstitutional as being vague and indefinite because it does not clearly define the terms "fraudulent," "dishonest," and "demonstratively incompetent." This contention is without merit: "The basic concept behind the vagueness doctrine is the idea of fairness, and that the statute should be sufficiently specific to provide notice of the type of conduct expected. The doctrine should not be used to create a constitutional dilemma out of the practical difficulties in drawing statutes." *State v. Strickland,* 532 S.W.2d 912, 921 (Tenn.1975).

■■ For a legislative body to attempt to define every word used in a statute, partic-

ularly such words as "dishonest" and "fraudulent," which, as used in almost any non-criminal context, have a well understood meaning, is too much to expect.

There is a presumption of the constitutionality of a statute. A non-criminal statute is not unconstitutionally vague where the statute is set out in terms that an ordinary person exercising ordinary common sense can sufficiently understand and comply. *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). *See also, Broadrick, v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15, *reh. denied* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974). *Big Fork Mining Co. v. Tenn. Water Quality Control Bd.,* 620 S.W.2d 515, 519 (Tenn.App.1981). The Supreme Court of Illinois made short work of such a contention in *Patchett v. Baylor,* 62 Ill.2d 426, 343 N.E.2d 484 (1976).

Citing *Jackson Mobilphone Co., Inc. v. Tennessee Public Service Commission,* 876 S.W.2d 106 (Tenn.Ct.App.1993), Mr. Mosley asserts that the action of the administrative tribunal was "arbitrary or capricious". In that case, this Court held:

Agency decisions not supported by substantial and material evidence are arbitrary and capricious. However, agency decisions with adequate evidentiary support may still be arbitrary and capricious if caused by a clear error in judgment.

A reviewing court should not apply Tenn.Code Ann. § 4–5–322(h)(4)'s 'arbitrary and capricious' standard of review mechanically. In its broadest sense, the standard requires the court to determine whether the administrative agency has made a clear error in judgment. An

arbitrary decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion.

*Jackson Mobilphone,* 876 S.W.2d at 110–111 (citations omitted).

The undisputed facts of this case establish that Mr. Mosley knew that he was repeatedly violating the laws of Georgia and Virginia and that he was exceeding the authority of his Tennessee license by his deliberate actions in this case. No "clear error in judgment" by the administrative tribunal has occurred in this case.

We now address the controlling issue. The Uniform Administrative Procedures Act, first adopted in Tennessee by Chapter 725 of the Public Acts of 1974, superceded and repealed earlier procedural statutes applicable to state agencies, with few exceptions. *Ogden v. Kelley,* 594 S.W.2d 702 (Tenn.1980). This act, at least as nearly as differing state government organization will allow, is patterned after the Federal Administrative Procedures Act. 5 U.S.C.A. § 551, et seq.

> Today every state has a body of legislation dealing with administrative procedure and control....
>
> ....
>
> The state systems have much in common, especially in terms of general principles. The fundamental principles have, over time, been guided by the general law based on both federal and state developments. It must be remembered that in any context, the basic concepts and principles must be adjusted to the particular administrative scheme whether state or federal.

Charles H. Koch, Jr., Administrative Law and Practice § 2.31 (2nd ed.1997).

■ Tennessee Code Annotated section 4–5–103 (1998) provides, in pertinent part:

> (a) This chapter shall not be construed as in derogation of the common law, but as remedial legislation designed to clarify and bring uniformity to the procedure of state administrative agencies and judicial review of their determination; and this chapter shall be given a liberal construction and any doubt as to the existence or extent of a power conferred shall be resolved in favor of the existence of the power.

In appellate application of this "substantial and material evidence" standard of review, it has been held:

> We use the same standard to review administrative decisions that trial courts use. *See Estate of Street v. State Bd. of Equalization,* 812 S.W.2d 583, 585 (Tenn.Ct.App.1990). When we are reviewing the evidentiary foundation of an administrative decision under Tenn.Code Ann. § 4–5–322(h)(5), we are not permitted to weigh factual evidence and substitute our own conclusions and judgment for that of the agency, even if the evidence could support a different determination than the agency reached. *See* Tenn.Code Ann. § 4–5–322(h); *Humana of Tenn. v. Tennessee Health Facilities Comm'n,* 551 S.W.2d 664, 667 (Tenn. 1977).

*Ware v. Greene,* 984 S.W.2d 610, 614 (Tenn.Ct.App.1998). Applying this standard to the undisputed evidence in this case, it is difficult to envision a basis upon which the administrative tribunal could have reached any other conclusion than that which it did reach as to the guilt of Mosley.

■ The controlling issue in this case, which involves the propriety of the sanctions imposed by the administrative tribunal, is subject to an even more restrictive

standard of appellate review. The Supreme Court of Tennessee has observed:

As noted by the learned Chancellor: "[t]he appropriate remedy is peculiarly within the discretion of the [agency] ..." Having found grounds to affirm the procedures employed, facts found, and conclusions reached, we will not interfere with the sanctions imposed upon Dr. McClellan. We remand for the appropriate imposition of those sanctions and tax the costs of this appeal to Dr. McClellan.

*McClellan v. Bd. of Regents,* 921 S.W.2d 684, 693 (Tenn.1996).

In reversing the United States District Court for the Middle District of Tennessee, the United States Court of Appeals for the Sixth Circuit held:

Determination of a sanction to be applied by an administrative agency, if within bounds of its lawful authority, is subject to very limited judicial review. *Kulkin v. Bergland,* 626 F.2d 181, 184 (1st Cir.1980). " 'The relations of remedy to policy is peculiarly a matter of administrative competence.' " *Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 185, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973) (quoting *American Power Co. v. S.E.C.,* 329 U.S. 90, 112, 67 S.Ct. 133, 146, 91 L.Ed. 103 (1946)). The reviewing court's function is only to "determine the validity of the questioned administrative action," not to review the sanctions. *Martin v. United States,* 459 F.2d at 302; *G.H. Miller & Co. v. United States,* 260 F.2d 286, 296 (7th Cir. 1958) (*en banc*) *cert. denied,* 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959).

While the de novo provision of the Food Stamp Act raises certain problems, it does not, in our view, call for a departure from the usual standard of review concerning sanctions.

*Kulkin v. Bergland* at 184; *see also Broad Street Food Market, Inc. v. United States,* 720 F.2d 217 at 220 (1st Cir. 1983). Once the trial court confirmed that there were repeated violations of the law and regulations as determined by appellant, "the court's only reasoning task is to examine the sanction imposed in light of the administrative record to judge whether the agency properly applied the regulations, *i.e.,* whether the sanction is 'unwarranted in law ... or without justification in fact....' " *See Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 185–189, 93 S.Ct. 1455, 1457–1459, 36 L.Ed.2d 142 (1973), cited in *Broad Street Food Market, supra,* at 220. We agree with the First Circuit's rationale in this respect. *Cf. Cross v. United States,* 512 F.2d 1212, 1218 (4th Cir.1975) (*en banc*). *See also* the incisive dissent by Rullel, J., in the latter case at 1222; *Wolf v. United States,* 662 F.2d 676, 678 (10th Cir.1981).

*Woodard v. U.S.,* 725 F.2d 1072, 1077 (6th Cir.1984).

The leading case relative to the standard of judicial review of sanctions imposed by an administrative agency is *Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973). The Court declares:

The applicable standard of judicial review in such cases required review of the Secretary's order according to the "fundamental principle ... that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.' " *American Power Co. v. SEC,* 329 U.S. 90, 112, 67 S.Ct. 133, 91 L.Ed. 103 (1946). Thus, the Secretary's choice of sanction was not to be overturned unless the Court of

Appeals might find it "unwarranted in law or ... without justification in fact...." *Id.,* at 112–113, 67 S.Ct. 133; *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *Moog Industries, Inc. v. FTC,* 355 U.S. 411, 413–414, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958); *FTC v. Universal–Rundle Corp.,* 387 U.S. 244, 250, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967); 4 K Davis, Administrative Law § 30.10, pp 250–251 (1958). The Court of Appeals acknowledged this definition of the permissible scope of judicial review but apparently regarded respondent's suspension as "unwarranted in law" or "without justification in fact." We cannot agree that the Secretary's action can be faulted in either respect on this record.

We read the Court of Appeals' opinion to suggest that the sanction was "unwarranted in law" because "uniformity of sanctions for similar violations" is somehow mandated by the Act. We search in vain for that requirement in the statute. The Secretary may suspend "for a reasonable specified period" any registrant who has violated any provision of the Act. 7 USC § 204. Nothing whatever in that provision confines its application to cases of "intentional and flagrant conduct" or denies its application in cases of negligent or careless violations. Rather, the breadth of the grant of authority to impose the sanction strongly implies a congressional purpose to permit the Secretary to impose it to deter repeated violations of the Act, whether intentional or negligent. *Hyatt v. United States,* 276 F.2d 308, 313 (C.A.10 1960); *G.H. Miller & Co. v. United States,* 260 F.2d 286 (C.A.7 1958); *In re Silver,* 21 Agric. Dec. 1438, 1452 (1962). The employment of a sanction within the authority of an administrative agency is thus not rendered invalid in a particular case because it is more severe than sanctions imposed in other cases. *FCC v. WOKO,* 329 U.S. 223, 227–228, 67 S.Ct. 213, 91 L.Ed. 204 (1946); *FTC v. Universal–Rundle Corp.,* 387 US, at 250, 251; *G.H. Miller & Co. v. United States, supra,* at 296; *Hiller v. SEC,* 429 F.2d 856, 858–859 (C.A.2 1970); *Dlugash v. SEC,* 373 F.2d 107, 110 (C.A.2 1967); *Kent v. Hardin,* 425 F.2d 1346, 1349 (C.A.5 1970).

Moreover, the Court of Appeals may have been in error in acting on the premise that the Secretary's practice was to impose suspensions only in cases of "intentional and flagrant conduct." The Secretary's practice, rather, apparently is to employ that sanction as in his judgment best serves to deter violations and achieve the objectives of that statute. Congress plainly intended in its broad grant to give the Secretary that breadth of discretion. Therefore, mere unevenness in the application of the sanction does not render its application in a particular case "unwarranted in law."

*Butz,* 411 U.S. at 185–88, 93 S.Ct. 1455.

In *Goldstein v. United States,* 9 F.3d 521 (6thCir.1993), affirming the district court in upholding an administrative decision disqualifying a store from participating in the food stamp program, the court held:

We recently examined the scope of judicial review under 7 U.S.C. § 2023 in *Abboud Market, Inc. v. Madigan,* 943 F.2d 51, 1991 WL 165656, No. 90–3695 (6thCir.Aug.29, 1991) (unpublished), and take this opportunity to reiterate that scope. "Determination of a sanction to be applied by an administrative agency, if within bounds of its lawful authority, is subject to very limited judicial review." *Woodard v. United States,* 725 F.2d 1072, 1077 (6thCir.1984) (citing *Kulkin v. Bergland,* 626 F.2d 181, 184 (1stCir.1980)); *Martin v. United States,*

459 F.2d 300, 301–02 (6thCir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 129, 34 L.Ed.2d 131 (1972). Once the trial court has confirmed that the store has violated the statutes and regulations, the court's only task is to examine the sanction imposed in light of the administrative record in order to judge whether the agency properly applied the regulations, *i.e.,* whether the sanction is "unwarranted in law" or "without justification in fact." *Woodard,* 725 F.2d at 1077 (quoting *Butz v. Glover Livestock Comm'n Co., Inc.,* 411 U.S. 182, 185–89, 93 S.Ct. 1455, 1458–59, 36 L.Ed.2d 142 (1973)). If the agency properly applied the regulations, then the court's job is done and the sanction must be enforced. The trial *de novo* is limited to determining the validity of the administrative action; the severity of the sanction is not open to review. *Woodard,* 725 F.2d at 1078 (quoting H.R.Rep. No. 464, 95th Cong., 1st Sess. 397–98, *reprinted in* 1977 U.S.C.C.A.N.1978, 2326–27).

Thus, the question before us is whether the FNS acted within its authority in permanently disqualifying Goldstein from the food stamp program. Because Goldstein was found to have violated the regulations by trafficking in food stamps, the penalty of permanent disqualification from participation in the program was imposed. 7 C.F.R. § 278.6(a) states that the FNS may impose the sanction of disqualification for a violation of the statutes or regulations; such disqualification shall be permanent if the disqualification is based on trafficking. Further, the regulations do not require that, before permanent disqualification is imposed, a store owner re-ceive a warning, intend to violate the regulations, or benefit from the trafficking. *See Woodard,* 725 F.2d at 1076 (sanction for trafficking regardless of owner's lack of knowledge of violation); *Freedman v. United States Dept. of Agriculture,* 926 F.2d 252, 261 n. 13 (3d Cir.1991) (noting that permanent disqualification of even an "innocent owner" is consistent with the legislative history of the statutes and regulations). The regulations thus authorize the FNS to prescribe the sanction imposed in this case.

*Goldstein,* 9 F.3d at 523–524.

In a similar context, the United States Fifth Circuit Court of Appeals explained the appropriate standard of review as to administrative sanctions.

Judicial review of an administrative sanction is extremely limited. The administrator's selection of the appropriate sanction to effectuate the statutory policy is one peculiarly within the administrative competence, and the administrative choice of sanction is not to be overturned on judicial review unless found to be either unwarranted in law or else without justification in fact. *Butz v. Glover Livestock Commission Co., Inc.,* 411 U.S. 182, 185–186, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973); *J. Acevedo and Sons v. United States,* 524 F.2d 977 (5th Cir.1975).

*Wayne Cusimano, Inc.,* 692 F.2d at 1030.

The Uniform Administrative Procedures Act is applicable to proceedings to revoke or suspend the license of an insurance agent. Tenn.Code Ann. § 56–6–161. Also, Tennessee Code Annotated section 56–6–155 provides: [1]

---

**1.** The provisions of this statute were in effect at the time of all of the events that form the basis for the revocation of the license of Mr. Mosley. Section 56–6–155 was repealed by

Chapter 798 of the Public Acts of 2002 effective January 1, 2003. Section 13 of Chapter 798 of the Public Acts of 2002 replaced former Tennessee Code Annotated section 56–6–

(a) The commissioner may suspend, revoke, or refuse to issue or renew any license under this part for any one (1) or more of the following causes:

. . . .

(7) Committing any unfair trade practice or fraud proscribed in this code;

(8) Using, in the conduct of affairs under such license, fraudulent, coercive, or dishonest practices;

. . . .

(10) Being demonstrably incompetent, untrustworthy, or financially irresponsible;

. . . .

(13) Violating, or failing to comply with, any insurance laws, or any lawful rule or order of the commissioner or of a commissioner of another state; or

(14) Any cause for which issuance of he license could have been refused had it then existed and been known to the commissioner at the time of issuance.

(b) In addition to or in lieu of any denial, suspension, or revocation of a license hereunder, the commissioner may assess a civil penalty against any person violating this part in an amount not less than one hundred dollars ($100) nor more than one thousand dollars ($1,000) for each violation.

Tenn.Code Ann. § 56–6–155 (2000).

■■■ At the conclusion of its extensive findings of fact, the administrative tribunal iterated conclusions of law, among which were:

53. Tenn.Code Ann. § 56–6–155(a)(8) states, in pertinent part, that the Commissioner may suspend, revoke, or refuse to issue or renew any license under this part if she finds that one holding a license to sell insurance has used, in the conduct of affairs under such license, fraudulent, coercive, or dishonest practices.

54. Tenn.Code Ann. § 56–6–155(a)(10) states, in pertinent part, that the Commissioner may suspend, revoke, or refuse to issue or renew any license under this part if she finds that one holding a license to sell insurance has been shown to be demonstrably incompetent, untrustworthy, or financially irresponsible.

55. Tenn.Code Ann. § 56–6–155(a)(13) states, in pertinent part, that the Commissioner may suspend, revoke, or refuse to issue or renew any license under this part if she finds that one holding a license to sell insurance has violated, or failed to comply with, any insurance laws, or any lawful rule or order of the commissioner or of a commissioner of another state.

56. The Tennessee Rules of Evidence state in Rule 202(a), under Mandatory Judicial Notice of Law, that "The Court shall take judicial notice of (1) the common law, (2) the constitutions and statutes of the United States and of every state, territory and other jurisdiction of the United States, (3) all rules adopted by the United States Supreme Court or by the Tennessee Supreme Court, and (4) any rule or regulation of which a statute of the United States or Tennessee mandates judicial notice." The Respondent's argument that by failing to enter into evidence the insurance statutes of the States of Georgia and Virginia the State has somehow failed to meet its burden is without merit. The

155, reiterating, in large measure, the same grounds for revocation as was contained in the previous section. Section 13 is codified as Tennessee Code Annotated section 56–6–112

(2003). These statutory changes are not deemed to materially affect the outcome of this case.

State did request that the undersigned take judicial notice of these statutes, and provided copies with its post-trial brief, as was arranged at the hearing.

57. The Code of Georgia Annotated, Section 33–23–4(a) states, in pertinent part, that no person shall act as or hold himself or herself out to be an agent, subagent, counselor, adjuster, or insurance agency in the State of Georgia unless such person first obtains a license from the State of Georgia.

58. The Code of Virginia Annotated, Section 38.2–1822 states, in pertinent part, that no person shall act as an agent in the transaction of insurance in the Commonwealth of Virginia unless he is licensed as an agent in the Commonwealth.

59. The State has met its burden of proof by a preponderance of the evidence that Mosley violated the laws of the commissioner of another jurisdiction on twelve (12) separate occasions by acting as an agent in the states of Georgia and Virginia on a total of twelve (12) different occasions without being licensed as an insurance agent in those states, as required by the laws of those states.

The sanctions imposed by the administrative tribunal upon Mr. Mosley were clearly warranted in law. In view of the essentially undisputed facts as found by the ALJ, no basis exists for finding that the sanction of revocation of license was "without justification in fact."

It is obvious from the entire administrative record and from argument at the bar of this Court that Mosley's repeated transgressions in taking applications for policies of insurance in the states of Georgia and Virginia while indicating that such applications were, in fact, executed in Tennessee were committed intentionally and with deliberation. He considered these transgressions to be of minimal significance and, in fact, to be merely accommodations to policy holders. However, he knew that he was not licensed to act as an insurance agent in either Georgia or Virginia, and it is clear that neither the State of Tennessee nor the administrative tribunal considering the case shared his view as to the seriousness of his actions.

Neither the chancery court nor the Court of Appeals is empowered to substitute judicial judgment in the place of the judgment of an administrative tribunal acting within the scope of its statutory authority. Neither the chancellor nor this Court may soften the sanctions imposed by the administrative tribunal as the sanctions imposed by the administrative tribunal are clearly warranted in law and justified in fact. At this point, the judicial inquiry comes to an end.

The trial court erred in modifying the sanctions imposed by the administrative tribunal. The judgment of the Chancery Court of Davidson County is reversed, and the judgment of the administrative tribunal is reinstated in its entirety.

Costs of the cause are assessed against Appellee, and the case is remanded to the trial court for such further proceedings as may be necessary.