# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### SEPTEMBER 8, 2010 Session

## KENNETH BEAL v. NASHVILLE ELECTRIC SERVICE a/k/a ELECTRIC POWER BOARD OF NASHVILLE AND DAVIDSON COUNTY

### Direct Appeal from the Chancery Court for Davidson County
No. 07-1151-IV     Russell T. Perkins, Chancellor

_____

### No. M2009-01604-COA-R3-CV - Filed October 28, 2010

_____

Employee had been absent from work on paid sick leave for an extended period of time when Employer conducted an investigation and learned that he was working as a real estate agent. An administrative law judge conducted a hearing and recommended termination. The Board unanimously upheld the ALJ's findings and terminated Employee. The chancery court affirmed. We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Henry D. Fincher, Cookeville, Tennessee, for the appellant, Kenneth Beal

Parks T. Chastain, Gordon C. Aulgur, Nashville, Tennessee, for the appellee, Nashville Electric Service a/k/a Electric Power Board of Nashville and Davidson County

## OPINION

## I. FACTS & PROCEDURAL HISTORY

Kenneth Beal began working for Nashville Electric Service ("NES") in 1997. He was initially employed as a lineman, but he was promoted to lineman working foreman in 1998. In July of 2004, Mr. Beal was suspended for five days without pay for allegedly falsifying his timesheets.[1]

At the time, Mr. Beal was scheduled to work four days per week for ten hours per day. The week after he served his suspension, Mr. Beal returned to work for one full day but took vacation time on each of the next three days. The following week, Mr. Beal "called in" and missed all four days on paid sick leave. Mr. Beal had never used a day of sick leave in his previous seven years of employment at NES. The next week, Mr. Beal missed one day on sick leave and used vacation time to miss most of another day. The next week, Mr. Beal used vacation time to miss part of one day.

Beginning with the following week, Mr. Beal was continuously absent from NES. He missed the entire workweek of August 16-19 on paid sick leave. He also missed the next week, August 23-26, on paid sick leave. During that time, Mr. Beal was "calling in" to his direct supervisor, but he was not providing doctor's excuses for his absences. On or about August 25, Mr. Beal was contacted by Anthony Richman, the Operations Manager at the NES facility where Mr. Beal worked. According to Mr. Richman, when the parties spoke, he informed Mr. Beal of NES's sick leave policy and that it was necessary for him to provide a doctor's excuse for his absences. On August 26, Mr. Beal faxed a doctor's excuse to NES that was dated August 16 and stated, "Bedrest + fluids until 9/1 due to illness." The excuse was signed by Travis Pardue, M.D.

On September 1, Mr. Beal faxed to NES a second excuse from Dr. Pardue that was dated September 1 and stated, "Bedrest + fluids until 9/20/04 due to illness." On September 20, Mr. Beal faxed another excuse from Dr. Pardue, dated September 20, that stated, "Excuse from work until 10/4/04 due to illness." Because these excuses were so frequent and for consecutive periods, Mr. Richman became concerned and notified his supervisor, Dennis Boehms, Vice President of Operations, of the situation. Mr. Boehms had been informed by other NES employees that Mr. Beal had stated that he "was going to use his sick leave up and quit NES" and that he was already selling real estate full-time. Mr. Boehms then obtained the necessary approval to hire a private investigator to look into the situation.

---

[1] Mr. Beal filed a grievance challenging his suspension, which remains pending.

On September 24, a private investigator provided surveillance of Mr. Beal and determined that he was away from his home from approximately 8:00 a.m. until 2:00 p.m. Mr. Beal ran errands and was observed traveling around the Lebanon area showing real estate properties to an unidentified individual. The investigator learned that Mr. Beal was a licensed real estate agent and registered with a local real estate company. The investigator was of the opinion that Mr. Beal was very active and exhibited no visible signs of injury or sickness. He reported his findings to Mr. Boehms, who asked for further investigation.

On October 4, Mr. Beal's previous excuse expired and he faxed in another excuse from Dr. Pardue, dated October 4, which stated, "Excuse due to illness until 10/18/04." On October 18, Mr. Beal faxed an excuse signed by a physician's assistant from Dr. Pardue's office, dated October 18, which stated, "Please excuse from work for the next 2 weeks due to sinus infection."

On October 26, another private investigator met Mr. Beal at a property that Mr. Beal had listed for sale, and Mr. Beal drove the investigator around to several other properties he had listed in the Lebanon area. During the course of the parties' conversation, Mr. Beal mentioned that he worked at NES. However, he stated, "I don't expect I'll be there much longer. The real estate thing is just really taking off this year. I spend more time doing this off on vacation." The investigator reported these findings to Mr. Boehms and again reported that Mr. Beal exhibited no visible signs of sickness or injury.

On November 1, Mr. Beal faxed another excuse from Dr. Pardue to NES, which stated, "No work from 11/1/04 until 11/15/04 due to illness." On November 2, 2004, Mr. Richman wrote a letter to the Electric Employees' Civil Service & Pension Board ("the Board") preferring charges against Mr. Beal. Mr. Richman reported that Mr. Beal had not reported to work since August 16, which amounted to 57 days of absences. Mr. Richman noted that Mr. Beal had been faxing in doctor's excuses, but he explained that during the time period covered by the excuses, Mr. Beal was observed traveling throughout the Lebanon and Mount Juliet areas showing real estate properties he had listed for sale and running errands. Mr. Richman alleged the following:

Mr. Beal's aforementioned actions are in violation specifically of paragraph 42.04, subparagraph (c) of the NES Policy Manual.[2] This paragraph states:

EMPLOYEE ABSENTEEISM
C.   Unsatisfactory attendance will result in disciplinary action

---

[2] This provision was apparently cited incorrectly and is found in section 41.04.

up to and including charges being preferred. Unsatisfactory attendance will also have an adverse effect on consideration for promotion.

Mr. Beal's unsatisfactory attendance is disruptive and places an unfair burden on other employees and his supervisor in the department. Failure of an employee to appear for work causes costly delays and difficulty in assigning other employees to take the place of the absentee.

Mr. Beal is also in violation of Rule 6.05 of the Civil Service Rules, as follows:

> Loyalty And Efficiency
> It is required that all persons accepting employment perform loyal and efficient work and services; that they use their best efforts to protect the property of Nashville Electric Service and its interests and cooperate in promoting and advancing its welfare at all times; that they strive to render the best possible service to the public including work assignments under emergency conditions; and that they comply with all operating and safety rules affecting their work.

Mr. Beal's conduct places him in violation of Section 2.0 of the NES Policy Manual. This section provides:

> Because employment at NES is a public trust, it is the policy of the EPB that the integrity of the Board and employees be foremost in ensuring proper conduct in conducting business, procuring goods and services, and dealing with governmental officials, customers, and other parties having any interest in NES.

Mr. Beal's actions additionally place him in violation of Section 63.0 of the NES Policy Manual. This section provides:

> An employee should conduct him/herself in a respectable manner while in the employment of NES and strive to be mindful of the rights of customers, individuals in the community, other employees, and the property of others. Inappropriate conduct which is disruptive to the operation and

-4-

workforce of NES is not permiss[i]ble. Such conduct may result in disciplinary action and, depending on its severity, may warrant the preferring of charges for termination.

. . . .

The undersigned charges that the aforementioned conduct of Mr. Beal has been willful, deliberate, does violate both the spirit and letter of the Rules of the Board and is so grave that the Board should consider dismissal of Mr. Beal as authorized by Rule 7.04 which reads as follows:

Dismissals
Disciplinary action up to and including discharge may be taken for insubordination, improper conduct, inefficient work performance, habitual tardiness, absenteeism, or for other causes when it is determined to be in the best interest of Nashville Electric Service. Discharge may occur only after charges have been filed and a hearing before the Board.

It is also charged that Mr. Beal violated a part of the oath which he took as an employee of the Board [in] which he swore to faithfully discharge the duties of his position.

Two days after charges were preferred, on November 4, 2004, Mr. Beal submitted a letter to NES from Dr. Pardue stating that Mr. Beal had been undergoing evaluation for "an unknown persistent illness" with symptoms of "headaches and dizziness." Dr. Pardue stated that Mr. Beal needed to be "in a controlled environment, not outdoors, while undergoing evaluation." On November 11, 2004, Dr. Pardue filled out Family Medical Leave Act ("FMLA") paperwork at the request of Mr. Beal. Dr. Pardue wrote on the form that Mr. Beal was currently unable to perform his duties at full capacity, but that he could work two to three hours per day.

The Board subsequently referred the matter of Mr. Beal's charges to an administrative law judge ("ALJ") for hearing.[3] Numerous witnesses testified at the hearing before the ALJ

---

[3] When charges are filed against an employee, the Board can hear the case itself or refer the case to an administrative law judge for hearing. Civil Service Rule 7.08. The administrative law judge must prepare and file with the Board a report with recommended findings and conclusions, together with the record of the hearing. Civil Service Rule 7.083(E). The Board may adopt, modify, or reverse the

(continued...)

on November 2, 2006. The private investigators testified about their surveillance of Mr. Beal and his activities during that time. The first investigator testified that Mr. Beal looked "fine" physically and that he did not "look like" he was hurting in any manner. The investigator said he never saw Mr. Beal take any medication or visit a doctor or hospital. The second investigator, who rode in Mr. Beal's vehicle with him for about thirty minutes, testified that Mr. Beal "appeared to be just fine." He said Mr. Beal did not look ill, complain about any ailments, or take any medication during the time he spent with Mr. Beal. The investigator also testified that Mr. Beal told him that he would not be working at NES very much longer because the real estate business was starting to do well and he was spending most of his time doing real estate work while "on vacation." The investigators' written reports and the video and audio tapes recorded during their surveillance were entered into evidence over the objection of Mr. Beal's counsel.

Another NES employee testified that he saw Mr. Beal at a local Cracker Barrel restaurant at approximately 8:30 a.m. one morning while Mr. Beal was on sick leave. He said that Mr. Beal appeared to be attending a business meeting, as he was with two or three other men who appeared to be businessmen, and Mr. Beal and the others were dressed in sports coats and carrying briefcases. He said Mr. Beal's physical appearance was normal.

The deposition of Dr. Pardue was entered into evidence. Dr. Pardue testified that he first diagnosed Mr. Beal with seasonal or chronic allergic sinusitis in October of 2000. At that time, Mr. Beal had reported that his allergies caused headaches. However, Dr. Pardue did not see Mr. Beal regularly for the next several years.

Dr. Pardue testified that he saw Mr. Beal on July 26, 2004, and that Mr. Beal had a sinus infection and was complaining of "some dizziness," which was presumably due to head congestion.[4]

Dr. Pardue next saw Mr. Beal on August 16, 2004. Mr. Beal still had a sinus infection and reported that his dizziness had gotten worse. At that visit, Dr. Pardue wrote an excuse for Mr. Beal to miss work until September 1 because of his dizziness from the sinus infection.

---

[3](...continued)
recommendation of the administrative law judge or remand for additional evidence. Civil Service Rule 7.085.

[4] Again, Mr. Beal was absent from work on sick leave July 26-29, on August 5, and continuously beginning on August 16.

Dr. Pardue saw Mr. Beal again on August 31, and Mr. Beal complained of head and chest congestion and a headache that had lasted several days. Dr. Pardue said Mr. Beal "basically . . . still had the sinusitis" and that his blood pressure was elevated. Dr. Pardue could not recall why the next excuse he wrote for Mr. Beal was dated September 1, the day after Mr. Beal's office visit. That excuse provided that Mr. Beal needed bedrest and fluids until September 20 due to illness. Dr. Pardue explained that he recommended bedrest and fluids mainly because of Mr. Beal's dizziness.

On September 15, Mr. Beal saw Dr. Pardue for a routine physical but Mr. Beal continued to complain of dizziness and a sinus infection. Dr. Pardue said that Mr. Beal's blood pressure was still high and that "he still had some sinus tenderness, but other than that everything seemed to be fairly normal." The next doctor's excuse provided by Dr. Pardue was dated September 20 and excused Mr. Beal from work until October 4.

On September 23, Mr. Beal saw Dr. Pardue again due to headaches. Dr. Pardue testified that Mr. Beal had "basically a sinus headache." He explained that Mr. Beal's headaches were caused by "a chronic sinus problem." Mr. Beal "called in" to Dr. Pardue on October 1 and requested another excuse from work due to his dizziness, and Dr. Pardue wrote an excuse that excused him from work until October 18.

Dr. Pardue next saw Mr. Beal on October 18, and he continued to complain of headaches, a sinus infection, and "some dizziness." On that date, the physician's assistant who works with Dr. Pardue wrote an excuse for Mr. Beal excusing him from work for the next two weeks "due to sinus infection." Dr. Pardue provided another excuse for Mr. Beal on November 1, excusing him from work until November 15.

Dr. Pardue saw Mr. Beal again on November 2, and Mr. Beal complained of coughing, sore throat, and left ear pain, and said that his "balance was off."[5] Dr. Pardue referred Mr. Beal to an ear, nose, and throat specialist, who performed a CT scan on November 5. The CT scan revealed that Mr. Beal had "clear paranasal sinuses," which means that he no longer had a sinus infection. However, there was some swelling inside the nasal cavity that was consistent with chronic allergies. An allergy test showed reactions to several pollens, animal danders, and molds. The ENT determined that these results were consistent with moderately severe perennial allergic rhinitis, or inflammation of the nasal cavity. He concluded that Mr. Beal's headaches and other symptoms were due to allergies.

Approximately two months later, on January 25, 2005, Mr. Beal returned to Dr. Pardue with a migraine headache, an eardrum infection, and elevated blood pressure. An

---

[5] November 2 was also the day that charges were preferred against Mr. Beal.

MRI was performed that revealed a "few white matter hyperintensities" that were "nonspecific," but "could be related to gliosis or possibly the sequela of migraine headaches." Dr. Pardue last saw Mr. Beal on February 2, 2005, and he complained that he was still having some headaches.

Dr. Pardue testified that throughout Mr. Beal's period of treatment, he probably could have gone into work for a few hours a day, but that his capabilities would depend on the task that he would be doing. Dr. Pardue testified that Mr. Beal could not climb poles or operate heavy machinery due to his dizziness, but that he could do paperwork or communicate with other employees and customers. Dr. Pardue also said that Mr. Beal could not work full-time outdoors, but that it was fine for him to be outdoors for two to three hours. When asked why his doctor's excuses flatly excused Mr. Beal from work for two-week periods, without specifying that he could work a few hours per day, Dr. Pardue simply said that he was more specific when completing the FMLA form because it asked a specific question. Dr. Pardue could not recall for certain whether Mr. Beal asked for doctor's excuses for two-week periods, but he said it "could have very well been that" Mr. Beal kept asking him to extend the excuses.

When asked about Mr. Beal's outdoor activities that were observed by the investigators, Dr. Pardue testified that someone with chronic sinus problems and dizziness "can still get out and function for short periods of time." He said that Mr. Beal reported "episodic" dizziness, meaning "coming and going," rather than continuous dizziness. In sum, Dr. Pardue said that Mr. Beal's restrictions required him to use good judgment, and that he could do part-time work when he felt like it.

A Line Supervisor at NES testified about the job responsibilities of a line working foreman, which was the position held by Mr. Beal. The Line Supervisor testified that a line working foreman works on the ground most of the time, while linemen do the line work. He said that the lineman working foreman's job is to instruct others on how to get jobs done safely. He indicated that it was not uncommon for a lineman working foreman to go a year or more without climbing a pole. He also said that someone in Mr. Beal's position would only be required to work in a bucket truck "maybe 10 percent" of the time.

At the hearing, Mr. Beal acknowledged that he was first diagnosed with "sinus issues" in 2000 and that he had never taken off work due to his condition prior to the summer of 2004. Mr. Beal said that his problems in 2004 were "[b]asically the same but had gotten a little more aggressive." Mr. Beal testified that he had not taken off work for his sinus problems in the past because he had not had migraines in the past. Mr. Beal claimed that he was "very sick" in the fall of 2004. He denied the allegation that he was taking sick leave because he was mad about his suspension, and he also denied that he intended to use all of

his sick leave and then quit working at NES.[6]  Mr. Beal claimed that when he stated to the investigator that he did not expect to be working at NES much longer, he meant that he would probably quit in the next one to two years.  Mr. Beal testified that he received his real estate license in February of 2004 and that he was "probably" showing real estate properties when he took vacation time off of work during the week after his suspension.  He also admitted to showing real estate properties and attending real estate closings while he was on sick leave.  Mr. Beal said that he tried to follow his doctor's instructions while showing real estate by staying indoors and rolling down his car window when he smoked.

Mr. Beal initially testified that he told Mr. Richman during their telephone conversation that he "was on light duty."  However, he went on to say, "I think we'd had that discussion.  I'm not exactly correct on what was said, but I told him what the doctor had told me I could do."  Mr. Beal admitted that the doctor's excuse he faxed to NES after his conversation with Mr. Richman stated that he needed "bed rest and fluids until 9/1 due to illness."  It did not state that he was able to work in any capacity.  Mr. Beal testified that he asked Dr. Pardue to write the excuses.  He said he did not know why the excuses did not state that he was able to work two to three hours per day.  When Mr. Beal was asked later in his testimony whether he ever informed "supervision" that he could work two to three hours per day, he said, "I'm not quite sure."  He said that he and his direct supervisor did have a conversation about his "abilities."  Still, he later testified as follows:

> Q.  Did you at any time – after August the 16th, when you were out continuously, did you ever notify the company that "I can work a little bit, you know, two or three hours, but I can't work any other than that"?  Did you ever notify the company?
> A.  No, sir.
> Q.  So you never gave the company an opportunity to say whether they could use you or not, did you?
> A.  No, sir, I didn't.
> . . . .
> Q.  Did you ever call NES and ask for an accommodation regarding your condition?
> A.  No, sir.

---

[6]  Mr. Beal acknowledged that if an employee quits working at NES, he or she will not get paid for remaining sick leave.

Mr. Beal testified that he was a union representative, and he suggested that his union activity motivated management's desire to terminate him. He insisted that he was in full compliance with NES practices regarding excused sick leave. He also testified that he was not aware of any policy against "moonlighting" or having a second job.

The deposition of Mr. Beal's direct supervisor, Tommy Reed, was introduced at the hearing. Mr. Reed was asked whether he thought that Mr. Richman was trying to find a reason to fire Mr. Beal, to which he responded, "I don't know if that's a yes or no. I would say that was a probably." However, Mr. Reed said that the problem between Mr. Beal and Mr. Richman "was more of a personality conflict . . . than anything."

Mr. Richman, the Operations Manager at NES, testified that he preferred charges against Mr. Beal because Mr. Beal was very active, engaging in work as a real estate agent, and displaying no visible signs of sickness or injury, while taking paid sick leave from NES. Mr. Richman testified that Mr. Beal never told him that he could perform "light work," and he said that Mr. Beal never asked him to accommodate his medical condition. He denied that his decision to institute disciplinary action was motivated by Mr. Beal's union activity.

Mr. Richman said that he explained to Mr. Beal during their telephone conversation that it was necessary for him to have a doctor's excuse for his absences when he missed more than four days in a six-month period.[7] Mr. Richman testified that Mr. Beal had not been in compliance with the sick leave rules prior to when he faxed in his first doctor's excuse on August 26 because Mr. Beal had missed more than four days without providing an excuse. However, Mr. Richman was of the opinion that Mr. Beal did comply with sick leave policy "[f]or those subsequent periods of time" by providing the subsequent doctor's excuses. Mr. Richman went on to testify that Mr. Beal violated NES's general absenteeism policy regarding "unsatisfactory attendance" based on the results of the investigation.

The deposition of Mr. Boehms, the Vice President of Operations, was also introduced. He testified that it was his idea to investigate Mr. Beal based upon the information he received from Mr. Richman about the frequency and length of Mr. Beal's excuses and the statements from other employees regarding Mr. Beal's real estate dealings and his intention to use his sick leave then quit NES. Mr. Boehms testified that the results of the investigation

---

[7] A document entitled "Sick Leave Rules" was entered into evidence, which stated that employees are expected to bring in a doctor's excuse when they exceed their unexcused sick leave allowance, which, for Mr. Beal's category of employment, was four days. The document further provided that the doctor's excuse must be provided within two days "from time being off." If an employee's use of unexcused sick leave exceeds the average, he or she is put on a four-step plan including counseling, reprimand, suspension, and charges recommending dismissal.

led him to conclude that Mr. Beal should be terminated.

The ALJ issued a lengthy report on December 27, 2006. The ALJ was of the opinion that the charges against Mr. Beal had been substantiated and she recommended that he should be terminated. The Board held a hearing on March 28, 2007, and voted unanimously to uphold the ALJ's recommendation of termination. Mr. Beal then filed a petition for review in chancery court.[8] Upon reviewing the record in accordance with the Uniform Administrative Procedures Act, Tenn. Code Ann. § 4-5-301, *et seq.*, the chancery court determined that there was substantial and material evidence to support the decision of the ALJ and the Board to terminate Mr. Beal and that the decision was not arbitrary or capricious. The court found no error in the procedure and evidentiary rulings in the hearing before the ALJ and found no merit in Mr. Beal's arguments. Mr. Beal timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

Mr. Beal presents the following issues, slightly restated, for review:

1. Whether the ALJ relied upon grounds for termination that were not set forth in the charges lodged against Mr. Beal;
2. Whether the ALJ erred in finding that Mr. Beal violated the excused sick leave policy when Mr. Richman testified that Mr. Beal was in compliance with the sick leave policy;
3. Whether the decision of the ALJ was not supported by substantial and material evidence;
4. Whether the ALJ relied upon an inapplicable NES policy to justify terminating Mr. Beal; and
5. Whether the ALJ acted arbitrarily and capriciously.

For the following reasons, we affirm the decision of the chancery court and uphold the decision of the Board.

## III. STANDARD OF REVIEW

Pursuant to Tennessee Code Annotated section 4-5-322(h), this Court may only reverse or modify the Board's decision if Mr. Beal's rights were prejudiced because the

---

[8] An employee has the right to appeal from decisions of the Board, within sixty days, to the chancery court of Davidson County. Civil Service Rules 7.09, 7.091, 7.092. The appeal is governed by Tennessee Code Annotated sections 27-9-114 and 4-5-322. Civil Service Rule 7.093.

Board's findings, inferences, conclusions or decisions were:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
    (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

The Board's decision cannot be reversed, remanded or modified except "for errors that affect the merits of such decision." Tenn. Code Ann. § 4-5-322(i).

## IV. DISCUSSION

### A. *Absenteeism & Sick Leave*

As explained above, Mr. Beal was charged with numerous violations of the NES Policy Manual and Civil Service Rules. According to the statement of charges submitted by Mr. Richman, Mr. Beal allegedly violated section 41.04 of the NES Policy Manual regarding "Employee Absenteeism," Rule 6.05 of the Civil Service Rules regarding "Loyalty and Efficiency," Section 2.0 of the NES Policy Manual regarding ethics, Section 63.0 of the NES Policy Manual regarding inappropriate conduct, and the oath that he took as an employee of the Board, in which he swore to faithfully discharge the duties of his position. Civil Service Rule 7.04 provides that "[d]isciplinary action up to and including discharge may be taken for insubordination, improper conduct, inefficient work performance, habitual tardiness, absenteeism, or for other causes when it is determined to be in the best interest of Nashville Electric Service" after charges have been filed and a hearing before the Board.

At the hearing before the ALJ, Mr. Beal argued that he could not be terminated under section 41.04 of the Policy Manual regarding "Employee Absenteeism" because he was in compliance with NES's sick leave policy. Mr. Beal presents the same argument on appeal. He contends that an employee who complies with NES's sick leave policy by providing doctor's excuses cannot be in violation of NES's general absenteeism policy. According to NES, however, "under Mr. Beal's theory an employee can present doctor's excuses stating he cannot work and needs bed rest but the employee can work a second job and receive his

-12-

salary from NES as long as the employee follows the technical procedure for requesting sick leave." NES claims that Mr. Beal was not charged with violating the sick leave procedures and that charges were preferred "based upon his false statements regarding his inability to work." At the hearing, Mr. Richman testified that Mr. Beal violated the general absenteeism policy, even though he provided doctor's excuses in accordance with the sick leave policy, based upon the results of the investigation. Mr. Richman stated that sick leave was but one subcategory of absenteeism.

The NES Policy Manual includes section 41.0, entitled "Employee Leave & Absenteeism," which includes several subcategories. Mr. Beal was charged with violating Section 41.04, regarding "Employee Absenteeism," which provides:

A.   Employees are expected to report for work on time.
B.   Unnecessary absenteeism and tardiness is expensive, disruptive, and places an unfair burden on other employees and the supervisor.
C.   Unsatisfactory attendance will result in disciplinary action up to and including charges being preferred. Unsatisfactory attendance will also have an adverse effect on consideration for promotion.

Section 41.06 is entitled "Sick Leave, Unexcused Use," and it provides that a specified amount of unexcused sick leave will be allowed for each appraisal period. It further provides a procedure for addressing situations in which employees exceed the allowable limit of unexcused sick leave.

The ALJ noted Mr. Beal's argument that an employee in compliance with the sick leave policy cannot be in violation of the general absenteeism policy. However, the ALJ basically did not reach the issue because she found that Mr. Beal was *not* in compliance with NES's sick leave policy. The ALJ found that Mr. Beal had never provided doctor's excuses for the sick leave days he missed from July 26 until July 29, and on August 5. She also found that although Mr. Beal submitted an excuse for the period of August 16 until September 1, he did not provide it until August 26, and excuses are required within two days from the time off. Thus, the ALJ concluded that Mr. Beal was in violation of NES's sick leave policy. She also went on to find that Mr. Richman "was well within the guidelines" when he determined that Mr. Beal's absenteeism was unsatisfactory attendance that was disruptive and placed an unfair burden on other employees, within the meaning of section 41.04, and that charges were validly preferred under that section.

Mr. Beal continues to argue on appeal that he cannot be charged with violating NES's absenteeism policy because he provided doctor's excuses in accordance with the sick leave policy. We disagree. Section 41.04 addresses "unnecessary absenteeism" and

"unsatisfactory attendance" that disrupts the work environment and unfairly burdens other employees. It specifically provides that unsatisfactory attendance will result in disciplinary action up to and including charges being preferred.[9] A separate section, 41.06, addresses sick leave. We reject Mr. Beal's contention that providing a doctor's excuse necessarily establishes satisfactory attendance under all circumstances. Regardless of whether Mr. Beal provided timely doctor's excuses technically complying with NES's sick leave policy, his attendance could be deemed unsatisfactory and his absence could be deemed unnecessary under section 41.04. Our interpretation is supported by Civil Service Rule 10.132, which provides that "Employees who abuse sickness and disability privileges or deliberately make or cause to be made false or misleading statements or claims may be subject to loss of such benefits and other disciplinary action up to and including discharge." Under Mr. Beal's theory, such discipline would be precluded as long as the employee had provided a timely doctor's excuse. Thus, we reject Mr. Beal's argument that he could not be charged with violating section 41.04 if he technically complied with section 41.06.

Next, Mr. Beal argues that the ALJ ultimately used her finding that he violated the sick leave policy "as her primary justification" for recommending his termination. Mr. Beal claims that because the charges preferred against him did not allege a violation of the sick leave policy, the ALJ acted arbitrarily and used an unlawful procedure such that her decision must be reversed.

Again, we disagree. The ALJ addressed the sick leave procedures in response to Mr. Beal's argument that he was in compliance with the sick leave policy. Aside from her earlier resolution of that issue, the ALJ stated her conclusion regarding the charges against Mr. Beal as follows:

> In conclusion, Employee was working as a realtor in uncontrolled environments while at the same time telling his Supervisor that he could not work which is a misuse of NES's sick leave policy. Thus, Employee's action of showing and selling real estate as a realtor and participating in other activities, such as discussions with others outside in an uncontrolled environment after conducting business as a realtor, while on sick leave and instead of working any time at NES was inappropriate, disrespectful and disruptive to the operations of NES because others in Employee's department had to do his work in addition to their own workload while he was out working

---

[9] The Civil Service Rules define "charges" as "a request to the Board that an employee be discharged." Civil Service Rule 1.0. The Rules also provide that "[d]isciplinary action up to and including discharge may be taken for insubordination, improper conduct, inefficient work performance, habitual tardiness, absenteeism, or for other causes when it is determined to be in the best interest of Nashville Electric Service." Civil Service Rule 7.04.

another job and making money while collecting his full salary and benefits from NES from being on sick leave. Lastly, it does not appear that Employee working a second job was a factor considered by management in deciding to terminate Employee. It was not because he had a second job that he was terminated. It was because he submitted doctor's excuses that specifically stated that he could not work due to illness, not specifying what employer the excuse was for and not specifying that he could work on a limited basis, but worked as a realtor while on paid sick leave and never disclosing to NES that he could work on a limited time basis. NES employees can work second jobs, but they cannot work a second job when they are submitting doctor's excuses saying they need bed rest.

Thus, the ALJ did not use Mr. Beal's untimely doctor's excuses as the "primary justification" for recommending termination. The ALJ concluded that Mr. Beal's overall conduct was a "misuse" of sick leave policy and that his absenteeism was "unsatisfactory attendance" that was "disruptive and plac[ed] an unfair burden on other employees and his supervisor" within the meaning of section 41.04. Her findings specifically tracked the language of section 41.04, which addresses "unsatisfactory attendance" and provides that "Unnecessary absenteeism and tardiness is expensive, disruptive, and places an unfair burden on other employees and the supervisor." We reject Mr. Beal's contention that he was terminated "for something with which he was never charged." Because we find that Mr. Beal was found guilty of violating section 41.04, we also find that he was not entitled to the benefit of the four-step procedure provided in section 41.06 for employees who simply exceed the allowable limit of unexcused sick leave. The policy manual specifically provides that unsatisfactory attendance under section 41.04 "will result in disciplinary action up to and including charges being preferred."

### B. Substantial & Material Evidence

On appeal, Mr. Beal claims that substantial and material evidence does not support the decision to terminate him. He argues that the ALJ erred in "ignoring" the deposition testimony of Dr. Pardue, and he claims that she made several erroneous factual findings. He also claims that he was fired due to his union activism.

Mr. Beal claims that the ALJ erred in her finding that he "had not been at home resting in bed as doctor's excuses had provided he do." He points out that only his first two doctor's excuses, covering August 16 until September 20, stated that he needed bedrest and fluids, and the other excuses simply stated that he should be excused due to illness. The investigation apparently did not begin until September 24, so when he was observed selling real estate, his doctor's excuse at the time did not mention bedrest.

Mr. Beal also claims that Mr. Richman testified during his deposition that Mr. Beal was in compliance with "the absenteeism policy" by providing his doctor's excuses. At trial, Mr. Richman attempted to clarify that Mr. Beal had complied with the sick leave policy by providing the excuses, but not the absenteeism policy. Mr. Beal argues that the ALJ "ignored Mr. Richman's credibility issues."

Mr. Beal also disputes the ALJ's finding that he missed 57 days of work, claiming that he only missed 45 days. From our review of the record, it appears that Mr. Beal had missed 11 consecutive full four-day workweeks when charges were preferred on Tuesday, November 2, 2004. This amounts to 46 consecutive workdays missed when charges were preferred. Mr. Beal had missed 5 days on sick leave in the month prior to this consecutive period.

Mr. Beal argues on appeal that "the sanction of termination is far excessive and not supported by substantial or material evidence." The substantial and material evidence standard requires something less than a preponderance of the evidence but more than a scintilla or glimmer. *Dickson v. City of Memphis Civil Service Comm'n*, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005); *Mosley v. Tenn. Dep't of Commerce & Ins.*, 167 S.W.3d 308, 316 (Tenn. Ct. App. 2004). "We may reject the Board's decision only if a reasonable person would necessarily reach a different conclusion based on the evidence. It is not enough that the facts could support a different conclusion." *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 265 (Tenn. 2009) (citing *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001)). When an administrative body has conducted a hearing and evaluated the witnesses as they testified, this Court gives the tribunal's credibility determinations great weight. *City of Memphis v. Civil Service Comm'n of City of Memphis*, 238 S.W.3d 238, 243 (Tenn. Ct. App. 2007).

Considering all of the evidence, we find that the Board's decision was supported by evidence that is both substantial and material in the light of the entire record. Mr. Beal was absent from work on paid sick leave for 46 consecutive workdays, or 11 weeks, when charges were preferred. He does not dispute that he could have worked a few hours per day during that time. The ALJ concluded that Mr. Beal never informed his supervisor that he was able to work for several hours a day. It is undisputed that Mr. Beal was actively selling real estate while taking paid sick leave. Mr. Beal's co-workers reported that he was simply using his sick leave before he quit, and at least one co-worker saw Mr. Beal at an apparent business meeting while out on sick leave. Clearly, a reasonable person could conclude that Mr. Beal's attendance was unsatisfactory and that his conduct was disruptive to his work environment in violation of section 41.04. This evidence also supports a finding that Mr. Beal failed to "perform loyal and efficient work and services; . . . use [his] best efforts to protect the property of Nashville Electric Service and its interests and cooperate in promoting and advancing its welfare at all times; . . . [and] strive to render the best possible service to

-16-

the public" in violation of Rule 6.05 of the Civil Service Rules regarding "Loyalty and Efficiency." It further supports the conclusion that he violated section 63.0 of the NES Policy Manual requiring employees to be mindful of the rights of customers and other employees and prohibiting "[i]nappropriate conduct which is disruptive to the operation and workforce of NES." Finally, we find that substantial and material evidence supports the Board's decision to terminate Mr. Beal for such conduct.

### C. Admissibility of the Investigator's Testimony, Report, and Tapes

Next, Mr. Beal argues that the investigator's testimony, report, and videotape "should [not] have been allowed as evidence" because they were allegedly obtained in violation of NES Policies 2.06 and 21.0.

Policy 21.0 provides that in order to protect customers and employees, the recording of meetings and conversations may take place under certain conditions. Presentations, meetings, and grievances may be video and audio recorded, and telephone and radio conversations may be recorded as well. Mr. Beal relies upon section 21.05, which provides that only certain recordings can be used "for processing a grievance at NES." The Civil Service Rules expressly recognize an employee grievance procedure that is separate and distinct from disciplinary action instituted by NES. Thus, we agree with the ALJ's conclusion that section 21.05 does not prohibit the use of recordings in resolving charges against an employee.

Next, Mr. Beal claims that Policy 2.06 requires anyone suspecting an ethics violation to report it to the Director of Audit and Internal Controls and also requires notice to an implicated employee that an investigation is beginning. Thus, Mr. Beal argues that management was required to notify him that he was about to be investigated and also required to notify the Director that Mr. Beal was suspected of an ethics violation. He claims that because these notices were not provided, the investigation was improper and therefore the investigator's testimony, report, and videotape should not have been entered into evidence at the hearing. The ALJ addressed the issue as follows:

> Section 2.06 does provide that anyone suspecting a violation of the ethics provisions beginning at section 2.01 must report his/her suspicions to the Director of Audit & Internal Controls (section 2.06 A) and said Director will notify the implicated Board member or employee that an allegation has been made and an investigation is beginning. However, . . . the provisions of 2.01 through 2.05 of the Manu[a]l cover the conduct of NES Board members and employees only with respect to either group's contact with and possible business relationships with contractors and/or vendors of NES. These provisions only cover an employee who is suspected of having improper

business dealings with an NES contractor or vendor. These provisions do not cover an employee's ethical conduct with respect to his employment with NES as an employee. Thus, NES was not required to contact the Director of Audit and Internal Controls or advise Employee that an investigation was being conducted on him concerning his alleged "unethical" behavior.

Mr. Beal claims that the ALJ's finding has "no textual basis." Although Mr. Beal's brief states that the ethics policy is "included in the record of this case," he does not cite to any specific portion of the record where the full text of the ethics policy can be found. Although we are under no duty to minutely search the record to verify allegations, *Long v. Long*, 957 S.W.2d 825, 828 (Tenn. Ct. App. 1997), we have searched the record for the sections relied upon to no avail. "Absent the necessary relevant material in the record an appellate court cannot consider the merits of an issue." *State v. Ballard*, 855 S.W.2d 557, 561 (Tenn. 1993). Because the relevant sections of the ethics policy are not included in the record before us, Mr. Beal's arguments regarding the admissibility of the investigator's testimony, report, and videotape are waived.[10] However, even if the investigator's testimony, report, and videotape were inadmissible, another NES employee who was not involved in the investigation testified that he had observed Mr. Beal at what appeared to be a business meeting while on sick leave. More importantly, Mr. Beal admitted at trial that he was showing real estate and attending real estate closings while absent from NES on paid sick leave. Therefore, any error in the admission of the investigator's report and recordings would have been harmless. *See* Tenn. Code Ann. § 4-5-322(i) (providing that the Board's decision cannot be reversed, remanded or modified except "for errors that affect the merits of such decision.").

### D. Statutory Violations

Next, Mr. Beal argues that the ALJ and the trial court "erroneously overlooked violations of the Americans with Disabilities Act, the Family Medical Leave Act and the Health Insurance Portability and Accountability Act." Mr. Beal's entire argument regarding these three alleged statutory violations includes one citation to one subsection of one statute. "[P]arties must thoroughly brief the issues they expect the appellate courts to consider." *Waters v. Farr*, 291 S.W.3d 873, 919 (Tenn. 2009). This "enables judges to be 'more confident in the results of their deliberations' because 'they have heard the issues argued by

---

[10] We also note that because the full text of section 2.0 is not in the record, we have not considered whether Mr. Beal violated the ethics policy. It was not necessary to find a violation of the ethics policy in order to sustain his termination, as Mr. Beal was also charged with violating section 41.04 regarding employee absenteeism and section 63.0 regarding inappropriate conduct, and both of those sections specifically provide that a violation of their respective terms may lead to termination. Civil Service Rule 7.04 also provides that "[d]isciplinary action up to and including discharge may be taken for . . . improper conduct [or] absenteeism . . . when it is determined to be in the best interest of Nashville Electric Service."

attorneys that are duty-bound to fully develop their opposing positions.'" ***Id.*** (citing *State v. Northern*, 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting)). We find that Mr. Beal has waived any argument based on the applicability of the ADA, FMLA, or HIPAA.

### E.    Evidentiary Rulings

Finally, Mr. Beal contends that the ALJ "applied a double-standard in her evidentiary rulings resulting in an arbitrary and capricious ruling." He contends that the ALJ was biased in favor of NES and that she arbitrarily enforced the rules of evidence in its favor. Strict adherence to the Tennessee Rules of Evidence, however, is not required in proceedings before the Board. *See **Davis***, 278 S.W.3d at 266.

> By their own terms, the Tennessee Rules of Evidence do not apply to administrative hearings, but rather to court appearances. Tenn. R. Evid. 101 ("These rules shall govern evidence rulings in all trial courts of Tennessee except as otherwise provided by statute or rules of the Supreme Court of Tennessee."). Therefore, the Tennessee Rules of Evidence do not apply unless the Board enacted a rule to adopt them. See *Goodwin v. Metro. Bd. of Health*, 656 S.W.2d 383, 388 (Tenn. Ct. App. 1983) ("[N]either the technicalities of the Civil Rules of Procedure nor the common law rules of evidence necessarily apply before nonjudicial bodies unless the rules of that body so require.") (emphasis added) (citing *Big Fork Mining Co. v. Tenn. Water Quality Control Bd.*, 620 S.W.2d 515 (Tenn. Ct. App. 1981); *L & N Railroad Co. v. Fowler*, 197 Tenn. 266, 271 S.W.2d 188 (1954)). . . . Accordingly, in reviewing decisions from these "less than legally formal hearings," appellate courts are guided, not by the Rules of Evidence, but instead "by a sense of fair play and the avoidance of undue prejudice to either side of the controversy and [must determine] whether ... the action of the hearing Board in admitting or excluding evidence was unreasonable or arbitrary." *Goodwin*, 656 S.W.2d at 388.

***Id.*** (footnotes omitted). Civil Service Rule 7.082 provides that "[h]earings before the Board or the Administrative Law Judge will be conducted in an informal manner with a presentation of all material facts, so that a fair, equitable, and impartial decision may be made."

At the outset of the hearing before the ALJ, counsel for Mr. Beal asked the ALJ, "I understand this is an administrative law hearing. Are we strictly following the rules of evidence in this hearing, or is it flexible?" The ALJ responded, "It's pretty flexible." Mr.

Beal contends that the ALJ's prejudice is demonstrated by the fact that she overruled his hearsay objection to the introduction of the investigator's written report and overruled his objection based on speculation when the investigator was asked whether Mr. Beal at any time during the surveillance "look[ed] like he was hurting in any manner." He also points out that during his questioning of the investigator on re-cross, he attempted to ask, "You don't know what medicines he was taking, do you?" The ALJ then sustained NES's objection based on exceeding the scope of the cross-examination and re-direct examination.

Later, however, the ALJ sustained Mr. Beal's objection to the wording of a question that his counsel admitted was quite "technical." From our review of the entire record of the hearing before the ALJ, we are confident that the ALJ did not act arbitrarily or demonstrate bias in favor of NES. Mr. Beal's assertion to the contrary is without merit.

## V.    CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to the appellant, Kenneth Beal, and his surety, for which execution may issue if necessary.

_____<br>
ALAN E. HIGHERS, P.J., W.S.