# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### MAY 4, 2011 Session

## ARCHIE STORY v. CIVIL SERVICE COMMISSION OF THE STATE OF TENNESSEE, ET AL.

### Direct Appeal from the Chancery Court for Davidson County
No. 08-386-II     Carol L. McCoy, Chancellor

---

### No. M2010-01214-COA-R3-CV - Filed July 5, 2011

---

A highway patrolman was terminated for allegedly deploying a tire deflation device without prior authorization in violation of General Order 412 and for untruthfulness regarding such. On appeal, the trooper argues that his partial extension of the device did not constitute a "deployment." Thus, he contends he did not violate General Order 412, nor was he untruthful when he denied deployment. We affirm the ALJ's finding that the trooper "deployed" the device in violation of General Order 412 and that he was untruthful about doing so. Accordingly, we find there existed substantial and material evidence to support his termination. Additionally, we find that the trial court did not err in denying the trooper's request to admit additional evidence and to supplement his brief.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Jonathan R. Perry, Franklin, Tennessee, for the appellant, Archie Story

Robert E. Cooper, Jr., Attorney General and Reporter, Joseph F. Whalen, Associate Solicitor General, Eugenie B. Whitesell, Senior Counsel, Nashville, Tennessee, for the appellee, Tennessee Civil Service Commission

**OPINION**

**I. FACTS & PROCEDURAL HISTORY**

On August 24, 2006, Tennessee highway patrolman Archie Story ("Appellant") heard over his radio that the Gibson County Sheriff's Department was involved in the pursuit of a vehicle, and Trooper Story went "to the general area to be able to assist[.]" Mr. Story stopped at a location ahead of the pursuit and retrieved his "stop sticks" (tire deflation device) from his trunk. He threw out the sticks, but they became tangled and did not extend into the lane in which the pursuit was occurring. The pursuit ultimately ended in a crash; however, neither the fleeing vehicle nor a Gibson County Sheriff's Department vehicle traveled over the stop sticks.

That night, Trooper Story sought the assistance of Lieutenant Steve Russell in filling out the crash report. Lt. Russell asked Trooper Story if he was involved in the pursuit, and he answered that he was not, but that he had attempted to "get ahead of the pursuit to deploy the tire deflation device." Lt. Russell then asked Trooper Story if he had, in fact, deployed the device, and Trooper Story answered that he had not.

However, the following day, Trooper Chris Rollins, who had been present with Mr. Story during the pursuit, telephoned Sergeant Donald DeSpain and informed him that Trooper Story had deployed his stop sticks. Sgt. DeSpain then met with Trooper Story to discuss the incident, and according to Sgt. DeSpain, Trooper Story admitted to deploying the stop sticks and to intentionally violating the General Order 412 which prohibits the "deployment" of stop sticks without prior approval.

Following an investigation into the incident, Trooper Story received a memorandum on October 30, 2006 from Colonel Mike Walker, notifying him that he was recommending Trooper Story be terminated for unprofessional conduct and for violating several Department of Personnel Rules and Tennessee Department of Safety General Orders, including deploying his stop sticks without prior approval and assisting another agency in a pursuit without a request to do so and without prior approval. Following a minimum due process hearing, Trooper Story was terminated on November 15, 2006.

Trooper Story then filed a grievance regarding his dismissal and ultimately appealed to the Tennessee Civil Service Commission on January 19, 2007. An administrative law judge upheld his termination, and Trooper Story petitioned the chancery court for judicial review on February 14, 2008. Trooper Story's counsel was substituted on January 7, 2009, and a motion was filed on January 4, 2010, seeking to supplement his brief and to admit new material evidence. The chancery court denied Trooper Story's motion, and it affirmed the

-2-

Civil Service Commission's decision to uphold his termination in an April 23, 2010 order. Trooper Story timely appealed to this Court.

## II. ISSUES PRESENTED

Appellant presents the following issues for review, summarized as follows:

1.  Whether the ALJ erred in finding that the department proved that Trooper Story violated General Order 412;

2.  Whether the ALJ erred in finding that Trooper Story was untruthful about deploying the stop sticks in violation of General Order 412;

3.  Whether the trial court erred in finding there existed substantial and material evidence to terminate Trooper Story;

4.  Whether the trial court erred in denying Trooper Story's request to admit additional evidence; and

5.  Whether the trial court erred in denying Trooper Story's request to supplement his brief.

For the following reasons, we affirm the ALJ's finding that Trooper Story "deployed" the device in violation of General Order 412 and that he was untruthful about doing so. Accordingly, we find there existed substantial and material evidence to support his termination. Additionally, we find that the trial court did not err in denying Trooper Story's request to admit additional evidence and to supplement his brief.

## III. STANDARD OF REVIEW

"The scope of review in the trial court of an order of an administrative agency is defined in [section 4-5-322(h) of the Tennessee code,]" *Metro Gov't of Nashville & Davidson County v. Shacklett*, 554 S.W.2d 601, 604 (Tenn. 1977), which provides:

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative finding, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in light of the entire record.
(B) In determining the substantiality of the evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

The scope of the review in this Court is the same as in the chancery court, and we must review the case under the same statutory criteria. *Humana of Tenn. v. Tenn. Health Facilities Comm'n*, 551 S.W.2d 664, 668 (Tenn. 1977); *see also Mosley v. Tenn. Dep't of Commerce and Ins.*, 167 S.W.3d 308, 316 (Tenn. Ct. App. 2004); *Estate of Street v. State Bd. of Equalization*, 812 S.W.2d 583, 585 (Tenn. Ct. App. 1990). "Our review of a trial court's decision with respect to agency findings is essentially a determination of whether the trial court correctly applied the standard of review set forth [in section 4-5-322(h) of the Tennessee Code]." *Wilson v. Univ. of Tenn. at Chattanooga*, No. M2000-02573-COA-R3-CV, 2001 WL 1660832, at *4 (Tenn. Ct. App. Dec. 28, 2001). Additionally, we will not reverse, remand, or modify an agency decision "unless for errors that affect the merits of such decision." **Tenn. Code Ann. § 4-5-322(I)**.

## IV. DISCUSSION

### A. ALJ's Findings of Fact

After hearing all the evidence, the administrative law judge ("ALJ"), sitting for the Tennessee Civil Service Commission, set forth the following findings of fact, in part, in her order:

2. On August 24, 2006, the Gibson County Sheriff's Department was involved in a pursuit of a vehicle. Grievant, who was at the Gibson County Highway Patrol Post, heard of the pursuit over the radio, and immediately decided to either observe o[r] be of assistance. He left the post, using his blue lights and siren on the way. He tried to determine where the chase was by radio contact with the Gibson County authorities. He did not advise the Highway Patrol post or his superiors of his intention to participate. The Sheriff's Department had

-4-

not requested assistance from the Highway Patrol. In fact, at one point the Grievant, while attempting to contact the Gibson County authorities, contacted the Highway Patrol Dispatch by error. He merely told the Highway Patrol Dispatch to disregard the contact. He did not advise them of his attempt to participate in the Gibson County pursuit.

3. Trooper Story arrived at a location in front of the pursuit, as did Trooper Chris Rollins. . . . Inasmuch as the[] use of [stop sticks] entails considerable risk to both the intended target, the person fleeing, and the officers chasing this person, there are specific general orders which govern their use.

4. Although there had been no request for use of the tire deflation device by the Gibson County authorities, and although there had been no authorization for use of the device by Grievant's Lieutenant, and although the Gibson County Sheriff's Department personnel in pursuit of the vehicle were not advised of it, Grievant "deployed" the tire deflation device on the road in front of the chase.

5. There is considerable disagreement among the parties as to whether the stop sticks were "deployed." The pursued vehicle and the pursuers both drove past the spot where Trooper Story threw out the stop sticks without damage to their tires, from which it is clear that the spikes did not go all the way across the road. It is also clear, however, that the Grievant did, in fact, cause the stop sticks to be deployed over a portion of the roadway, and thus they could have resulted in damage, and perhaps grievous injury, to those involved in the chase had they driven over that portion of the roadway in which the stop sticks were deployed. The disagreement among the parties concerns whether placing them over just a part of the roadway constitutes "deploying" the sticks. It seems clear that placing the stop sticks where they could rip out someone's tires means the sticks were deployed, the only possible disagreement being whether they were "fully" deployed.

6. On the night of the 24th, Grievant's supervisor, Lieutenant Steve Russell, assisted Grievant in filling out an incident report of the eventual crash that occurred during the pursuit. Lieutenant Russell asked Grievant if he was involved in the pursuit. The Grievant said that he was not, but that he had tried to get in front of the pursuit to deploy the tire deflation device. Lieutenant Russell asked the Grievant whether he had deployed the stop sticks, and the Grievant replied that he had not.

7.   The following day, August 25, 2006, Grievant's first line supervisor, Sergeant Donald DeSpain, told Lieutenant Russell that the Grievant had admitted to deploying the tire deflation device. Sergeant DeSpain learned from Trooper Rollins that the device was deployed, and when he asked the Grievant about it, the Grievant told him that he had, in fact, deployed the device. In fact, the Grievant told the Sergeant that he had deliberately violated the relevant General Order relating to use of the stop sticks. Sergeant DeSpain told the Grievant that he should fill out another incident report since he was "involved" in the pursuit. The Grievant was requested to include in this report his conversation with Lieutenant Russell. In his report, the Grievant stated that he could not recall the details of his conversation.

. . . .

9.  The proof clearly establishes that the Grievant, a long time veteran who had participated in other pursuits, was well aware of the General Orders relating to what his conduct should have been in this incident. It further clearly establishes that he deliberately did not follow these General Orders; further, he then lied about it to his superior. What Trooper Story reports, whether to dispatchers, in reports, or to his superiors, depends upon its effect on him; truth gives way to convenience, consistently.

10.  All of Grievant's supervisors testified that truthfulness was important to a trooper, and that a trooper who is known to be untruthful reflects badly on the integrity of the department, causes strained working relationships, and could cause a loss of credibility with the public and perhaps in court cases. It is clear that by his repeated failure to follow General Orders, and then his untruthfulness regarding these lapses, Trooper Story had caused his ability to discharge the functions of his job to sink to a level where he is unable to adequately discharge his duties. (footnote omitted).

11.  The Grievant testified in this matter regarding the use of the stop sticks, and other matters. The undersigned carefully scrutinized his demeanor. His testimony is not credited.

The ALJ then concluded that the Department had proven by a preponderance of the evidence that Trooper Story violated General Orders 102 (obedience to orders and chain of command); 216-2(IV)(B)(1)(b) (willful disobedience of rules and regulations or negligent disregard thereof); 216-2(IV)(B)(14)(c) (falsifying or withholding material from a statement or report); 411(X)(A) (pursuit driving); 412(III)(A) (use of tire deflation devices); and 800(VI)(H)

(keeping the communications center advised of your status). It further found that Trooper Story's actions constituted grounds for termination under Civil Service Rule 1120-10.06(8), "for the good of the service[,]" based on "his disregard for rules relating to pursuits, and the danger to people[,]" as well as his inability to "be trusted to truthfully report what he saw or did[, which is] an essential part of his duties[.]" Accordingly, the ALJ upheld Trooper Story's termination.

On appeal, Trooper Story challenges two of the ALJ's findings: that he violated General Order 412 and that he was untruthful about "deploying" the stop sticks in violation of General Order 412. We address each contention below.

### 1. Violation of General Order 412

General Order 412 provides in part:

It is the policy of the Tennessee Department of Safety to allow uniformed, commissioned members to utilize tire deflation devices in the performance of their duties when the use of such devices is necessary for the preservation of peace, life, and well being of the citizenry of the state. . . . The use of tire deflation devices will be strictly governed by the provisions of this Order.

Tire deflation devices will be used in pursuit situations only. Furthermore, the device will only be used after all other means of apprehension have failed. . . .

The use of tire deflation devices will be governed by sound professional judgment and the procedures outlined in this policy. Should allied agencies request the THP to utilize tire deflation devices, members of the department are permitted to do so only after obtaining approval from an on-duty supervisor.

. . . .

The following criteria shall be met prior to the use of tire deflation devices:

1. There is reasonable cause to believe the suspect has committed an offense justifying arrest of the suspect.
2. The officer attempting to apprehend the suspect has given notice of command to stop to the suspect by means of both visual and audible emergency equipment.

3. The suspect ignores the efforts and warnings that would be obvious and visible to a reasonable person in the suspect's position.
4. The officer has obtained authorization to utilize the tire deflation devices from an on-duty supervisor.

. . . .

Tire deflation deployment plans should include provisions for close coordination between pursuing units and the officer deploying the devices.

. . . .

After deploying the tire deflation devices, everyone at the scene should immediately retreat to a safe location.

On appeal, Trooper Story argues that the Department failed to prove that he "deployed"[1] the stop sticks in violation of General Order 412. He does not allege that he requested or received authorization to use his stop sticks. Instead, he argues that authorization was unnecessary because he did not "deploy" his stop sticks. He concedes that he "partially extended" the stop sticks; however, he maintains that stop sticks are "deployed" only when they are "actually . . . used and fully deployed so as to be capable of the function for which they are intended; to-wit, to flatten automobile tires." Thus, because the stop sticks did not extend "all the way across the road[,]" Trooper Story argues, they were not "deployed" and General Order 412 was not violated.

At the Commission hearing, Trooper Story testified regarding the events of August 24, 2006. He stated that upon parking his vehicle ahead of the pursuit, he "went to the trunk to retrieve the stop sticks; I started to throw - - as I realized when I started to throw I did not call the proper chain-of-command, I retrieved the stop sticks immediately back to myself." He admitted that the sticks did "hit the pavement" but he insisted that they did not fully extend because they became "tangled up" when he tried to "quick[ly]" retrieve them. He contradicted Sgt. DeSpain's testimony that he had admitted to deploying the stop sticks. He claimed that he answered "no" when asked by Sgt. DeSpain if he had deployed his stop sticks, because "[i]n [his] mind," "[t]he term deployment means that you use a piece of tool,

---

[1]General Order 412 interchangeably uses the terms "deploy," "use," and "utilize." The parties specifically dispute whether Trooper Story "deployed" the stop sticks; however, our analysis of this term applies equally to the terms "use" and "utilize."

as a stop sticks in its complete function to perform their duties completely." [sic].

The videotape from Trooper Story's patrol car was introduced into evidence. In the video Trooper Story tells Trooper Rollins to "block the road so I can get spikes out." After the chase passes, Trooper Story states "Well my damn spikes got tangled up and I couldn't - she didn't swerve off or nothing." When asked whether the fleeing vehicle ran over the spikes, he answers, "No, they missed her tire by that much." At the hearing, Trooper Story testified that his spikes only "went two feet out" and that his statement that the fleeing vehicle missing "by that much" referenced a distance of roughly "twelve or thirteen feet."

Lieutenant Steve Russell testified regarding the rationale behind General Order 412. He explained that deploying stop sticks without notification is "a completely unsafe thing to do, [and can] put[] people's lives in jeopardy[.]" "[I]f you were to travel across [stop sticks unknowingly you could] puncture your tires . . . lose control of your vehicle and cause a crash."

Sgt. DeSpain testified that Trooper Story admitted to him that he had deployed his stop sticks. Sgt. DeSpain stated that he told Trooper Story that he hoped he wouldn't "get in big trouble over [the incident]," and that Trooper Story responded by stating "yeah, but this time I intentionally violated the General Order." He further opined that Trooper Story had "deployed" the stop sticks, stating that "[d]eployment would be to take the object, cast it into the roadway with the intention of stopping or interfering with the traffic going down the road, and that's obviously what occurred."

Captain Robert Melton also testified that he believed Trooper Story had "deployed" his stop sticks, stating "It's just like if you shoot a gun, it don't go off, you know. Either it works or it doesn't work. He attempted it, and just because . . . they didn't fulfill their obligation and go across the road, the intention of him trying to throw those spikes is there, it doesn't matter whether they worked or didn't work."

Major Johnny Savage also stated his belief that Trooper Story had "deployed" his stop sticks. He described "deployment" as a process of "taking the . . . spikes out . . . and getting them prepared to deploy and throw out in the roadway to stop the vehicle as it comes through the location that you were at." Failure to "fully extend" across the roadway, he maintained, does not prevent "deployment."

We find that the testimony from Sgt. DeSpain, Captain Melton, and Major Savage supports the ALJ's finding that Trooper Story's partial extension of the stop sticks constituted "deployment" as contemplated by General Order 412, and thus, that Trooper Story's failure to obtain prior authorization was a violation of such order. Furthermore, the

-9-

language of General Order 412, itself, supports this finding. The order authorizes the use of stop sticks only as a last resort, it highlights the importance of communication between the pursuing unit and the deploying officer, and it details several prerequisites to the use of stop sticks in an attempt to minimize the risk of personal injury and property damage. Like the chancery court, we find "ridiculous" Trooper Story's contention that an ineffective placement does not require prior approval, as a partial extension equally evokes the safety concerns that General Order 412 is designed to address.[2]

## 2. Untruthfulness with Regard to Deployment

Trooper Story also argues that the ALJ erred in finding that he was untruthful about deploying the "stop sticks" in violation of General Order 412. He argues that because "deployment" and "use" are undefined in General Order 412, the terms are "subject to the interpretation of actors involved in the use of the 'stop sticks.'" Thus, he maintains, because he subjectively believed that he had not deployed the stop sticks, he was not untruthful when he denied doing so.

Trooper Story's supervisors testified before the ALJ regarding the importance of truthfulness in the law enforcement profession. Lt. Russell stated that Trooper Story violated policy by deploying his spike stripes without prior approval; however, he continued, "what concerned me even more was the fact that when I point blank asked Trooper Story if he had, in fact, deployed the strips, he denied doing so." He explained that truthfulness is "of the utmost importance of our position and our job, to be completely candid and truthful in everything you do." Furthermore, he stated that he would have difficulty trusting Trooper Story in the future, and that he would not want him as a colleague. Lt. Russell also described a telephone conversation he had with Trooper Story following the incident. He claimed that Trooper Story apologized for "letting [him] down" and stated that "he was truthful the first time [regarding his prior termination] and it didn't help[,]" which Lt. Russell interpreted as an admission of untruthfulness as to the current incident.

Major Savage stated that Trooper Story intentionally withheld material from a statement or a written report when he failed to explain his deployment–partial or

---

[2]Trooper Story devotes a considerable portion of his argument regarding "deployment" to challenging the ALJ's reliance upon Sgt. DeSpain's testimony that Trooper Story admitted to intentionally violating General Order 412. He asserts that Sgt. DeSpain's testimony cannot be credited, and that his "gratuitous assertion . . . cannot tip the balance in favor" of the Department because Trooper Story has "equally refute[d]" Sgt. DeSpain's testimony. We note that the ALJ specifically discredited Trooper Story's testimony and the chancery court agreed with this assessment. Furthermore, we find there is substantial and material evidence apart from Sgt. DeSpain's testimony to support the conclusion that Trooper Story deployed his stop sticks in violation of General Order 412.

otherwise–to Lt. Russell, instead of merely denying deployment in toto when specifically questioned about the incident. Sgt. DeSpain likewise testified that based upon Trooper Story's being "less than truthful" he would not be able to "work with him in harmony and trust him as [he] should be able to[.]" He also testified that when he asked Trooper Story, on August 31, to recount the details of his conversation with Lt. Russell on the night of the incident in which he denied deploying the stop sticks, he claimed that he could not remember the conversation details.

We note that Trooper Story's argument that he did not technically "deploy" the stop sticks did not surface until his supervisors learned through Trooper Rollins that some deployment had occurred, and we find his argument, at best, disingenuous. However, assuming Trooper Story honestly believed he had not deployed his stop sticks, he was, nonetheless, less than forthcoming with the full details of the incident. From the evidence before the ALJ, we find that she could reasonably conclude that "What Trooper Story reports, whether to dispatchers, in reports, or to his superiors, depends upon its effect on him; truth gives way to convenience, consistently." We find no error in the ALJ's findings regarding Trooper Story's untruthfulness.

### B. Request to Admit Additional Evidence and Supplement Brief

As we stated above, after petitioning the chancery court for judicial review, Trooper Story's counsel was substituted in January 2009, and a motion was filed to supplement his brief and to admit new material evidence in January 2010. On appeal, Trooper Story argues that the chancery court's denial of his motion was error.

### 1. Additional Evidence

Trooper Story explains that the motion "was more in the nature of an offer of proof" and that if allowed, he would have presented evidence in "the following general categories[:]"

I.   Evidence of the bias of Trooper Story's superiors;
II.  Evidence of the hearing by the Internal Affairs Division held on January 25, 2006;
III. Evidence of the Tennessee Highway Patrol's policy change and re-opening of other cases where the Internal Affairs Division kept no records;
IV.  Evidence relating to Trooper Story's prior suspension;
V.   Evidence regarding the investigation by Trooper Story regarding the

crash in Gibson County on or about August 24, 2006;

VI.     Evidence of Trooper Story's service record, commendations; and

VII.     Evidence of the proper regulation and process for internal evaluations.

Specifically, Trooper Story claims that "inappropriate actions" were taken against him in 2004 and 2006 for refusing to dismiss a speeding ticket issued to a Benton County Sheriff's Deputy, for refusing to alter an accident report, and for filing a workplace harassment charge against his captain. He also claims that no notes or records were made during a 2006 Internal Affairs hearing regarding his "prior conduct[,]" and that he "was treated differently" in this hearing because of his prior reports against his superiors. He further claims that the THP reopened other cases in which no record was kept, but that the THP refused to reopen his case.

Trooper Story also argues that he should have been allowed to introduce evidence regarding his prior suspension stemming from two November 2005 incidents. In the first incident, Trooper Story was dispatched to investigate a vehicle on Interstate 40. The Department maintains that Trooper Story improperly classified the vehicle as "abandoned" to avoid the necessity of an investigation although the vehicle had "clearly struck the guardrail." However, Trooper Story claims that he had been instructed to classify such vehicles as "abandoned," and that "[e]vidence supporting this protocol was not admitted at the Administrative Law Hearing." That same month, Trooper Story was dispatched to work a wreck, but because he claims he was taking medication which made him drowsy, he became unable to drive and pulled off the road. He claims that the ALJ did not allow him to "introduce medical proof informing the Tennessee Highway Patrol of the effects of the medication on Trooper Story."

Regarding the August 2006 incident at hand, Trooper Story contends that the chase ended when a Gibson County Sheriff's vehicle "ramm[ed] his squad car into the suspect's vehicle." However, he claims that Sgt. DeSpain "disagreed with Trooper Story's findings and requested that the report be changed to reflect that the suspect rammed the Sheriff's Deputy's squad car." Trooper Story initially refused to do so.

Finally, Trooper Story argues that evidence relating to his "service record and commendations" and "[d]etailed explanations of [his] evaluations were not admitted at the Administrative Law Hearing despite all of the alleged misconduct by Trooper Story." Although his "Superior" evaluations were apparently introduced, he maintains that "[t]he elements and factors involved in the 'Superior' rating were not addressed at the hearing."

The trial court's review of an administrative decision is generally limited to the administrative record. Tenn. Code Ann. § 4-5-322. However,

If, before the date set for hearing, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings or decisions with the reviewing court.

Tenn. Code Ann. § 4-5-322(e). Additionally "in cases of alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in the court." Tenn. Code Ann. § 4-5-322(g).

We find subsection (g) inapplicable in this case, as Trooper Story's argument regarding failure to maintain a record of his hearing apparently relates to a prior incident rather than to the disciplinary proceeding at issue in this case. Thus, to admit the evidence requested, Trooper Story must rely upon subsection (e), which requires the requesting party show "to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency[.]" Tenn. Code Ann. § 4-5-322(e).

Before the ALJ, Trooper Story testified regarding the alleged retaliation against him for refusing to dismiss a citation and for refusing to alter a vehicle crash report. He also testified that after he filed his workplace harassment claim, the disciplinary recommendation against him was increased from suspension to termination. Although we find that the substance of the November 2005 incidents was irrelevant to the disciplinary proceeding at hand, we note that Trooper Story was allowed to testify that he was taking medication and that he became drowsy. Furthermore, the record already contains numerous performance evaluations of Trooper Story, including a positive evaluation by Sgt. DeSpain in February 2007, and we find allowing further evidence of the same character would not produce a different outcome.

On appeal, Trooper Story also seeks to introduce evidence that Sgt. DeSpain asked him to falsify the vehicle crash report to reflect that the fleeing suspect rammed the Gibson County Sheriff's Department vehicle. However, at the hearing, Trooper Story testified that although he had initially believed that the police vehicle initiated the contact, after a full

-13-

investigation he had determined otherwise.[3]

In sum, we find that the trial court did not err in refusing to admit the evidence proffered by Trooper Story as it was either irrelevant, already in evidence, or would not affect the merits of the agency decision. Furthermore, we note that Trooper Story has offered no "good reason," or any reason whatsoever, for his failure to present the requested evidence at the agency hearing. *See* Tenn. Code Ann. § 4-5-322(e).

## 2. Brief Supplement

Trooper Story claims that his initial brief "was limited in scope as to whether [he] had 'deployed' the tire deflation devices and depending upon the answer to that question, whether [he] was truthful when asked about the tire deflation devices." However, if the trial court had allowed him to supplement his brief, he would have "advance[d] additional legal arguments and further discuss[ed] the evidence that was already in the record."

Our review of Trooper Story's motion reveals that he sought to supplement his brief based upon the additional evidence he requested the court to admit, not upon evidence already in the record. Accordingly, because we have found that the trial court properly denied his motion regarding the admission of evidence, we find that it did not err in denying his motion to supplement.

## C. *Existence of Substantial and Material Evidence*

Finally, we address Trooper Story's argument that the trial court erred in finding that substantial and material evidence existed to support his termination. Specifically, he incorporates his arguments regarding "deployment" of his stop sticks in violation of General

---

[3]Numerous documents were attached to Trooper Story's motion to admit additional evidence. He fails to cite this Court to the document allegedly supporting his claim that he was told to alter his vehicle crash report regarding the cause of the crash on August 24, 2006. However, he apparently relies upon a memorandum from Captain Melton which states that Trooper Story initially concluded that a Gibson County vehicle had caused the contact and that if he had "been allowed to produce a crash report faulting the Sheriff's Department, when in fact they were not at fault, our relationship with that Department could have been compromised." We note that this memorandum does not contradict Trooper Story's testimony before the ALJ, nor does it lend support to his current argument that he was pressured to untruthfully report the cause of the accident.

Order 412 and untruthfulness concerning such deployment. He also again challenges the trial court's denial of his request to admit additional evidence. Based on our above conclusions with respect to these matters, we find that substantial and material evidence existed to support Trooper Story's termination. The decision of the chancery court is affirmed.

## V. CONCLUSION

For the aforementioned reasons, we affirm the ALJ's finding that Trooper Story "deployed" the device in violation of General Order 412 and that he was untruthful about doing so. Accordingly, we find there existed substantial and material evidence to support his termination. Additionally, we find that the trial court did not err in denying Trooper Story's request to admit additional evidence and to supplement his brief. Costs of this appeal are taxed to Appellant, Archie Story, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.